# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 51546

KEITH THAETE, STEVE KING, and
LANCE THAETE,

    Plaintiffs-Appellants,

v.

ST. LUKE'S MAGIC VALLEY MEDICAL
CENTER, and MICHAEL R. FRY, D.O.,

    Defendants-Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, June 2025 Term

Opinion Filed: July 29, 2026

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Twin Falls County. Michael P. Tribe, District Judge.

The district court's order granting summary judgment is <u>reversed</u> in part, and the case is <u>remanded</u> for further proceedings.

Hepworth Holzer, LLP, Boise, for Appellants Keith Thaete, Steve King, and Lance Thaete. Andrew J. LaPorta argued.

Quane McColl, PLLC, Boise, for Respondents, St. Luke's Magic Valley Medical Center and Michael R. Fry. Alec T. Pechota argued.

---

MEYER, Justice.

In this medical malpractice appeal, we review a district court's grant of summary judgment to a hospital and an attending physician entered after the court excluded the plaintiffs' expert testimony as untimely or lacking foundation. Sherry Thaete died in January 2021 at St. Luke's Magic Valley Medical Center after hospital staff administered Paxil, a medication her psychiatrist had discontinued and was contraindicated with her current prescription, Nardil. Her husband and two sons (the Thaetes) sued Dr. Michael Fry and St. Luke's (the Respondents) under Idaho's Medical Malpractice Act. The district court concluded that without admissible expert testimony the Thaetes could not establish a prima facie case under Idaho Code sections 6-1012 and 6-1013.

We hold that: (1) the Thaetes' failure to serve their notice of appeal is not a jurisdictional defect requiring dismissal; (2) the district court erred in striking Dr. McIlraith's August 28 declaration, though it acted within its discretion in striking the Thaetes' August 29 supplemental

1

response; (3) Dr. McIlraith possessed an adequate foundation under Idaho Code sections 6-1012 and 6-1013 to offer a standard-of-care opinion; and (4) the district court did not err in concluding that Nurse Chisum's expert disclosure omitted an opinion that St. Luke's nursing staff breached the applicable standard of care. We vacate the amended judgment, partially reverse the district court's order granting summary judgment, and remand the case for further proceedings.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On January 15, 2021, Keith Thaete brought his wife, Sherry Thaete, to St. Luke's Magic Valley Medical Center in Twin Falls, Idaho, because she was disoriented and unable to communicate. Mr. Thaete brought two of his wife's prescription bottles—phenelzine (Nardil) and Ativan—with him to the hospital. Mr. Thaete recalls showing the bottles to an unidentified nurse in the emergency room and later to another female nurse after his wife was admitted and transferred to an upper floor. Mr. Thaete also believed, though he could not state definitively, that he showed the prescription bottles to Dr. Fry, the attending physician. An ER nurse, Nurse Brown, remembers Mr. Thaete providing two prescription bottles to him, and that he handed the bottles to Dr. Fry. Nurse Brown recalls Dr. Fry looking at the bottles before returning them to Mr. Thaete, but the doctor did not enter the medications into the computer system in Nurse Brown's presence.

During Mrs. Thaete's hospitalization, Dr. Fry prescribed her paroxetine (Paxil), a medication her psychiatrist had discontinued months earlier when initiating Nardil, another medication. Paxil and Nardil are contraindicated drugs and pose a significant risk when taken concurrently. Despite conflicting testimony as to whether Dr. Fry was aware of Mrs. Thaete's Nardil prescription, Paxil was administered. Mrs. Thaete died two days after being admitted to the hospital.

In October 2021, the Thaetes filed a complaint and demand for jury trial against the Respondents. Although labeled as "negligence, negligence per se, and reckless conduct," the Thaetes' claim was brought under Idaho's Medical Malpractice Act. The Respondents filed an answer on November 19, 2021, denying all material allegations.

The district court's original April 2022 scheduling and pretrial order required the Thaetes to disclose expert witnesses no later than 120 days before trial and the Respondents to do so no later than 75 days before trial. The order set a ten-day jury trial to begin on October 31, 2023.

The scheduling order was amended twice before discovery concluded. The first amendment required the Thaetes to disclose expert witnesses 210 days before trial and the

2

Respondents to disclose their expert witnesses 120 days before trial. A second amendment extended the Respondents' expert disclosure deadline by 35 days to August 7, 2023, while setting the Thaetes' rebuttal deadline 21 days later, on August 28, 2023.

The parties engaged in extensive discovery. The Thaetes served written discovery on January 26, 2022, and moved to compel twice. The Thaetes' discovery requested documentation regarding the policies and practices for internists prescribing medications at St. Luke's. The Respondents objected, arguing that the request was overly broad. In response, the Thaetes narrowed their request. The Thaetes' first motion to compel was denied due to their failure to meet and confer with opposing counsel. In March, the district court partially granted the Thaetes' second motion to compel and imposed a temporal limitation on the internal policy request.

Both parties timely disclosed expert witnesses. The Thaetes deposed Dr. Fry and Nurses Victor and Brown. The Respondents produced relevant hospital policies on March 28 and April 10, 2023. The Respondents deposed the Thaetes' experts, Dr. Dodson and Dr. McIlraith. In June, the Thaetes filed a supplemental witness disclosure identifying Nurse Tripp.

On August 1, 2023, the Respondents filed a motion for summary judgment, contending that the Thaetes could not establish a prima facie case of medical malpractice against Dr. Fry or St. Luke's. They argued that Dr. McIlraith's opinions lacked foundation for a standard of care opinion against Dr. Fry; that Dr. Dodson's opinions lacked foundation for a standard of care opinion against St. Luke's; that Nurse Chisum's disclosure did not contain a breach opinion; and that Nurse Tripp's disclosure was untimely.

A hearing on the Respondents' motion for summary judgment was initially scheduled for September 5, 2023. The Thaetes filed a motion to extend their August 15 response deadline, and on August 17 the district court granted the motion, ordered the Thaetes' response be filed no later than August 22, and because of its calendar, rescheduled the hearing for September 19. The Thaetes filed a timely opposition brief on August 15. They then filed rebuttal expert declarations on August 28 and a supplemental response on August 29—six and seven days after the August 22 deadline.

The Respondents moved to strike the Thaetes' August 28 and 29 filings. The district court granted both the Respondents' motion to strike and motion for summary judgment. The court gave three reasons for striking the filings: untimeliness, improper rebuttal designation for a dispositive motion addressing the Thaetes' case-in-chief, and new standard-of-care opinions that would

prejudice the Respondents. The court then concluded that Dr. McIlraith's opinions were inadmissible because he failed to show actual knowledge of the community standard of care, Nurse Chisum's disclosure did address the element of breach, and Nurse Tripp's disclosure was untimely. Without admissible expert testimony, the court concluded that the Thaetes could not establish a prima facie medical malpractice case and entered judgment in favor of Dr. Fry and St. Luke's.

The Thaetes moved for reconsideration, challenging the court's exclusion of all three expert witnesses. The district court denied the motion for reconsideration. Regarding Nurse Chisum, the court determined that the Thaetes had not disclosed any breach of the standard of care opinion from Nurse Chisum in their initial or rebuttal expert disclosures, nor had they submitted a timely declaration to supplement the record indicating that she would testify to a breach of the standard of care by nursing staff. The court also cited representations by the Thaetes' counsel that Chisum was unwilling to testify, which contradicted their later position on reconsideration. Regarding Nurse Tripp, the court reiterated that her disclosure was untimely, as it violated the amended scheduling order.

With regard to Dr. McIlraith, the district court maintained that he lacked the necessary foundational basis to provide opinions concerning Dr. Fry's actions. Despite recognizing that shared board certification might support familiarity with the standard of care, the court ultimately concluded that the lack of precision in Dr. Fry's deposition and the insufficient evidence regarding Dr. McIlraith's preparation did not meet the requirements under Idaho Code sections 6-1012 and 6-1013. The district court entered final judgment for the Respondents.

The Thaetes timely filed a notice of appeal but did not serve the notice on the Respondents. Twelve days later, the Respondents filed a motion to dismiss the Thaetes' appeal, arguing that both filing and service are jurisdictional requirements. This Court denied the motion without prejudice and ordered the parties to address the issue in their substantive briefing and at oral argument.

## II. ISSUES ON APPEAL

1. Does the Thaetes' failure to serve the notice of appeal require automatic dismissal?
2. Did the district court err in granting the Respondents' motion to strike the Thaetes' expert witness' declaration and supplemental response?
3. Did the district court err in determining that Dr. McIlraith lacked foundation to offer a standard of care opinion?
4. Did the district court err in determining that Nurse Chisum's disclosure omitted a breach opinion?

4

5. Did the district court err in granting summary judgment?

6. Is either party entitled to attorney fees on appeal?

## III. STANDARDS OF REVIEW

This Court reviews summary judgment de novo, applying the same standard the trial court employed in its rulings on the motion for summary judgment. *Summerfield v. St. Luke's McCall, Ltd.*, 169 Idaho 221, 228, 494 P.3d 769, 776 (2021). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Owen v. Smith*, 168 Idaho 633, 640, 485 P.3d 129, 136 (2021) (quoting I.R.C.P. 56(a)). "Summary judgment is improper 'if reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented.'" *Id.* at 641, 485 P.3d at 137 (citation omitted). "This Court liberally construes the record in favor of the party opposing the motion for summary judgment and draws any reasonable inferences and conclusions in that party's favor." *Summerfield*, 169 Idaho at 228, 494 P.3d at 776 (citation omitted).

The admissibility of expert testimony is a threshold question, separate from whether the testimony creates a "genuine issue[] of material fact sufficient to preclude summary judgment." *Id.* at 228, 494 P.3d at 776 (quoting *Arregui v. Gallegos-Main*, 153 Idaho 801, 804, 291 P.3d 1000, 1003 (2012)). In determining admissibility, the standard of liberal construction does not apply. *Id.* at 228–29, 494 P.3d at 776–77 (citing *Mattox v. Life Care Ctrs. of Am., Inc.*, 157 Idaho 468, 473, 337 P.3d 627, 632 (2014)). The trial court must instead examine the expert's affidavit or deposition to determine whether it alleges facts which, if true, would make the testimony admissible. *Fisk v. McDonald*, 167 Idaho 870, 879, 477 P.3d 924, 933 (2020).

Evidentiary rulings, including the grant of a motion to strike, are reviewed for abuse of discretion. *See id.* at 879, 891, 477 P.3d at 933, 945. This Court applies the four-part *Lunneborg* test to evaluate discretionary decisions: whether the trial court (1) correctly perceived the issue as discretionary; (2) acted within the bounds of its discretion; (3) applied the correct legal standards; and (4) reached its decision through reasoned analysis. *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

## IV. ANALYSIS

The Thaetes ask this Court to reverse the district court's orders granting summary judgment in favor of the Respondents and denying their motion for reconsideration. Six issues frame our analysis, and we address them in the order that their resolution requires. We first address a

threshold question raised by the Respondents: whether the Thaetes' failure to serve their notice of appeal deprives this Court of jurisdiction and requires dismissal. We then turn to three evidentiary and substantive rulings challenged by the Thaetes: (a) the district court's order striking Dr. McIlraith's August 28 declaration and the Thaetes' August 29 supplemental response; (b) the court's determination that Dr. McIlraith lacked foundation under Idaho Code sections 6-1012 and 6-1013 to offer a standard-of-care opinion; and (b) the court's determination that Nurse Chisum's expert disclosure omitted an opinion that St. Luke's nursing staff breached the standard of care. We next address the grant of summary judgment to the Respondents, which rested entirely on the evidentiary rulings analyzed above and therefore follows from our resolution of them. Finally, we address the parties' requests for attorney fees and costs on appeal.

## A. Service of a notice of appeal is not a jurisdictional requirement, and the Thaetes' failure to serve does not require automatic dismissal.

The first issue is whether the Thaetes' failure to serve a notice of appeal on the Respondents constitutes a jurisdictional defect that requires automatic dismissal of the Thaetes' appeal. On January 29, 2024, the Thaetes timely filed their notice of appeal but did not serve it on the Respondents. It is unclear from the record whether the Thaetes ever served the Respondents. Despite the Thaetes' service defect, the Respondents filed a motion to dismiss two weeks later on February 12, 2024.

The Respondents do not dispute that the Thaetes timely filed their notice of appeal. However, they argue that the failure to timely file *and* serve the notice deprives this Court of jurisdiction to hear the appeal. They rely on Rules 14 and 20 of the Idaho Appellate Rules. The former requires an appellant to file a notice of appeal within 42 days after a district court's final judgment or order. *See* I.A.R. 14(a). The latter requires the appellant to serve that notice "upon all persons who were parties and who appeared in the proceedings below[.]" I.A.R. 20.

The Thaetes respond that only compliance with the deadline for filing the notice of appeal is jurisdictional. They maintain that while service is mandatory, it is not jurisdictional; therefore, it does not require dismissal of their appeal. The Thaetes acknowledge that Rule 21 of the Idaho Appellate Rules provides that defects in service are subject to sanctions but emphasize that their service defect did not prejudice the Respondents.

Failure to serve a notice of appeal is not jurisdictional and does not require automatic dismissal. Under Idaho Appellate Rule 21, "[t]he failure to physically file a notice of appeal . . . within the time limits prescribed by these rules, shall be jurisdictional and shall cause automatic

dismissal of such appeal or petition, upon the motion of any party, or upon the initiative of the Supreme Court." I.A.R. 21. However, the "[f]ailure of a party to timely take any other step in the appellate process shall not be deemed jurisdictional, but may be grounds only for such action or sanction as the Supreme Court deems appropriate, which may include dismissal of the appeal." *Id.*

Idaho Appellate Rule 20 more specifically governs service of documents on appeal. It requires the appellant, "[a]t the time of the filing of a notice of appeal . . . , [to] serve copies thereof upon all persons who were parties and who appeared in the proceedings below, whether or not they are parties to the appeal[.]" I.A.R. 20. Although Rule 20 mandates service of the notice of appeal, it contains no language indicating that failure to serve is jurisdictional. The Idaho Appellate Rules provide that the timely filing of a notice of appeal is a jurisdictional requirement under Rule 21, whereas service is not a jurisdictional requirement under Rule 20.

The Respondents cite *Moe v. Harger*, 10 Idaho 194, 195, 77 P. 645, 645 (1904), and *Harris v. Bechtel Corp.*, 74 Idaho 308, 310, 261 P.2d 818, 819–20 (1953), cases in which this Court stated that the failure to file *and* serve a notice of appeal was a jurisdictional issue. Their reliance on these cases is misplaced for three reasons. First, both cases predate the current Idaho Appellate Rules, which superseded all conflicting prior precedent. *See* I.A.R. 1 ("These rules shall take effect on July 1, 1977, and thereafter all laws and rules of appellate procedure in the Supreme Court in conflict therewith shall be of no further force or effect."). Second, both were decided on statutory grounds that the current rules have since replaced. *Moe*, 10 Idaho at 195, 77 P. at 645 (decided under Rev. Stat. §§ 4807(3), 4808 (Idaho 1887)); *Harris*, 74 Idaho at 310, 261 P.2d at 819 (decided under former I.C. § 72-609). Third, neither case turned on a service defect. The appellant in *Moe* served the respondent but filed untimely, and the cross-appellant in *Harris* never filed. *See Moe*, 10 Idaho at 195, 77 P. at 645; *Harris*, 74 Idaho at 310, 261 P.2d at 819.

The Respondents' remaining authorities, *Helgeson v. Powell*, 54 Idaho 667, 34 P.2d 957 (1934), *Finlayson v. Humphreys*, 67 Idaho 193, 174 P.2d 210 (1946), *Mortimer v. Riviera Apartments*, 122 Idaho 839, 840 P.2d 383 (1992), and *Campbell v. Bonneville County Board of Commissioners*, 126 Idaho 222, 880 P.2d 252 (1994), are also unpersuasive. In *Campell*, the Court did not dismiss the appeal because the unserved respondent did "not have an interest in the outcome such that its presence [was] essential . . . ." 126 Idaho at 225, 880 P.2d at 255. In *Helgeson*, the Court dismissed the appeal against one unserved respondent, but proceeded to the merits against all other properly served respondents. 54 Idaho at 673, 34 P.2d at 959. In *Finlayson*, the Court

dismissed the appeal "for want of jurisdiction" because the unserved respondent "*might* be prejudicially affected by" its outcome. 67 Idaho at 195, 174 P.2d at 211 (decided under former I.C. § 11-202). Finally, in *Mortimer*, the Court dismissed the appeal because the unserved respondent "was not given notice or an opportunity to defend" and had a "direct interest in the outcome of the appeal," which could cause "potentially significant financial consequences . . . ." 122 Idaho at 846, 840 P.2d at 390. Thus, as we explained in *Campbell*, when "[r]ead together," *Helgeson*, *Finlayson*, and *Mortimer* "demonstrate that the essential question before the Court in this case is whether or not the [unserved respondent] would be adversely affected by this Court's ruling on the merits of the appeal . . . ." 126 Idaho at 225, 880 P.2d at 255.

In this case the Respondents, who fully participated in this appeal, would not be adversely affected by this Court reaching the merits of the Thaetes' appeal. The Thaetes filed their notice of appeal nineteen days after the district court entered the final judgment. Filing was therefore timely, and this Court has jurisdiction to hear the appeal. The defect in serving the notice of appeal on the Respondents, in this case, does not require automatic dismissal. *See* I.A.R. 21. Instead, this Court has the discretion to determine whether the untimely service of or failure to serve a notice of appeal on the Respondents warrants sanctions, which may include dismissal of the appeal. *See id.*

The Respondents did not advocate for an alternative sanction. They are only seeking dismissal of the appeal by this Court. Dismissal is not an appropriate sanction, considering that "[i]t has long been judicial policy in Idaho that controversies be determined and disposed of each on its own particular facts and as substantial justice may require." *Hollis v. State*, 174 Idaho 168, 177, 551 P.3d 1262, 1271 (2024) (quoting *Bunn v. Bunn*, 99 Idaho 710, 711, 587 P.2d 1245, 1246 (1978)). "The exercise of judicial discretion should tend to bring about a judgment on the merits." *Id.* (citation modified). Moreover, unlike the respondents in *Helgeson*, *Finlayson*, *Mortimer*, and *Campbell*, who were not given notice or an opportunity to defend against the appeal, the Respondents in this case have fully participated in the appeal, including filing their motion to dismiss within 12 days of the filing of the notice of appeal and submitting briefs on the merits.

In summary, because service is not jurisdictional under Idaho Appellate Rule 21 and dismissal is not a warranted discretionary sanction under these circumstances, we will proceed to evaluate the merits of the issues raised on appeal.

**B. The district court acted within its discretion in granting the motion to strike the Thaetes' supplemental response but abused its discretion in granting the Respondents' motion to strike Dr. McIlraith's declaration.**

The Thaetes challenge the district court's decision granting the Respondents' motion to strike Dr. McIlraith's August 28 declaration and their August 29 supplemental response to the Respondents' motion for summary judgment. The court rested its decision on three grounds: (1) the filings violated the August 22 deadline set by the court's August 17 order; (2) the declaration was designated as rebuttal and therefore procedurally improper to oppose a dispositive motion addressing the Thaetes' case-in-chief; and (3) the declaration introduced new standard-of-care opinions that would prejudice the Respondents. The Thaetes do not challenge the exclusion of the declarations of Nurse Tripp and Dr. Dodson; they appeal only the exclusion of Dr. McIlraith's August 28 declaration and their August 29 supplemental response.

We hold that the district court acted within its discretion in excluding the supplemental response but exceeded its discretion in excluding Dr. McIlraith's declaration in its entirety. Before we address each of the district court's three grounds in turn, it is important to understand the progression of the case and the manner in which the parties conducted discovery.

The Thaetes served the Respondents with their first set of interrogatories, requests for production, and requests for admission on January 26, 2022. In Request for Production No. 9, the Thaetes requested, "[A]ll standards, memorandums, letters, by-laws, or other such documentation which relates [sic] to the policies, procedures and practices for an internist working with or at St. Luke's." St. Luke's objected to the request, arguing that it was overly broad. In response to the objection, the Thaetes acknowledged the breadth of the request and proposed that St. Luke's provide those documents "for internists at St. Luke's when prescribing prescriptions."

On April 8, 2022, the district court issued the first scheduling order, notice of trial setting, and pretrial order, which scheduled a ten-day jury trial to begin on October 31, 2023. The parties were only required to disclose expert witnesses in response to discovery requests. If requested, the Thaetes were required to disclose their expert witnesses at least 120 days before the trial, and the Respondents at least 75 days before the trial. For any motion for summary judgment, the scheduling order required the moving party to file the motion at least 35 days before the hearing, with opposing briefs and affidavits due at least 21 days before the hearing.

The scheduling order further explained that the district court would not entertain discovery motions unless accompanied by a written, signed certification by counsel confirming an effort to

9

resolve disputes voluntarily. The order explained, "A party's obligation to fully and timely respond to discovery requests is distinct from any obligation imposed by this order, and no party may rely upon the [o]rder or any deadline it imposes as justification for failing to timely respond to discovery requests or to supplement prior responses." The parties were required to offer and serve all discovery on the opposing party, with responses due at least 30 days before trial. In addition, any supplemental responses under Rule 26(e) of the Idaho Rules of Civil Procedure must have been served at least 30 days before trial, and any required discovery supplementation must have been made "in a timely manner."

In the following months, the Respondents engaged in extensive motion practice, including filing motions to amend the scheduling order, to change venue, for a protective order and to seal, and to compel. The Thaetes contested every motion. On June 6, 2022, the district court granted the Respondents' motion to modify the scheduling order, providing an earlier timeframe than previously required for the Thaetes and the Respondents to disclose expert witnesses. This amended scheduling order also added a requirement for both parties to disclose all information regarding expert witnesses under Rule 26(b)(4) of the Idaho Rules of Civil Procedure. The Thaetes' and the Respondents' deadlines were as follows:

**(Plaintiffs' experts—retained or non-retained)**

1. **210** days before trial, Plaintiffs shall disclose each person Plaintiffs intend to call as an expert witness at trial and state the subject matter on which the witness is expected to testify.

2. **210** days before trial, Plaintiffs shall disclose all information required by Rule 26(b)(4) of the Idaho Rules of Civil Procedure regarding expert witnesses.

3. **70** days before trial, Defendants shall complete any depositions of Plaintiffs' initial retained expert witnesses.

**(Defendants' expert—retained or non-retained)**

4. **120** days before trial, Defendants shall disclose each person Defendants intend to call as an expert witness at trial and state the subject matter on which the witness is expected to testify.

5. **120** days before trial, Defendants shall disclose all information required by Rule 26(b)(4) of the Idaho Rules of Civil Procedure regarding expert witnesses.

6. **70** days before trial, Plaintiffs shall complete any depositions of Defendants' retained expert witnesses.

**(Plaintiffs' rebuttal experts—retained or non-retained)**

7. **100** days before trial, Plaintiffs shall disclose each person Plaintiffs intend to call as an expert witness at trial to rebut new information or issues disclosed or raised by Defendants.

8. **100** days before trial, Plaintiffs shall disclose all information required by Rule 26(b)(4) of the Idaho Rules of Civil Procedure regarding expert witnesses.

9. **40** days before trial, Defendants shall complete any depositions of Plaintiffs' rebuttal expert witnesses.

The Thaetes filed their first motion to compel discovery in early November 2022, which the district court denied because the court was uncertain whether the meet-and-confer standards had been met. Email correspondence between the parties' attorneys from December 2022 to February 2023 reflects that the efforts to resolve the discovery dispute quickly devolved. On December 2, the day after the motion to compel hearing, the Thaetes' counsel invited the Respondents' counsel to discuss the discovery disputes at his office:

> I am following up on the Court's oral ruling yesterday on Plaintiffs' Motion to Compel. . . .
>
> Regarding the substance of the motion to compel, I believe at the hearing St. Luke's argued it was not responsible for providing any additional information, supplemental answers, or evidence. Please let me know if my understanding is correct.
>
> If St. Luke's wants to provide additional information or evidence, please let me know what it expects that will be, and we can confer about reasonable solutions. If you would like to meet, I invite you to discuss at my office on Monday or Tuesday, December 5 or 6.

The Respondents replied, "Please let us know which of our discovery responses you may have contention with, and we will respond." After the Thaetes identified seven interrogatories and two requests for production they previously requested, the Thaetes asked, "Please let me know if you need more than a couple of days to respond to these requests for information. I will calendar it to follow up on Friday, 12/29, if I don't receive a response." To which, the Respondents' emailed:

> I received your email at the very end of the business day yesterday, in which you gave us less than two days in which to provide a response to your request for information and documents. This deadline is highly unrealistic considering some of the types of information you seek, including information that may not be in our firm's possession but will need to be obtained from our clients, then reviewed by us, before potential production to you. As such, your deadline does not comport with a good faith attempt to meet and confer. We will thoroughly respond to your email as soon as possible.

11

The Thaetes clarified:

> I am not filing a motion to compel on Friday. I'm giving you until Friday to respond to my email and tell me whether or not you are going to provide new information. All of these issues have been identified before, briefed, and argued at a motion to compel. St. Luke's has previously refused to produce new information. I believe this is a reasonable time frame [sic] to tell me whether it intends to do the same thing it has been doing.
>
> So, by Friday, tell me whether you will provide new information, and please be specific.

That Friday morning, the Thaetes followed up with a request for an update, again offering to meet in person that afternoon, and the Respondents replied, in part:

> Your attempts at meeting and conferring are unfair and do not comply with the Rule and do not reflect the scope of the requests you have made or the position in which my clients have been placed relative to your clients' intransigence with Rogg 26 and RFP 40 and 44.
>
> That being said, please see the responses [bolded], below.
>
> . . . .
>
> Interrogatory No. 8 asks St. Luke's to identify people "with knowledge" and specifically ask [sic], for each person, St. Luke's to set forth "the subject matter about which they possess information or knowledge." We are particularly concerned with people who received information relating to the medication Sherry was to be administered. You have not identified the "subject matter" known by any of the witnesses you identified. Please do so.
>
> **Your characterization ignores the medical records which have been produced. Your continued refinement of the question also, flips on its head, the process we have now brought up to the [c]ourt serially and that is, what medications did Keith Thaete bring to [St. Luke's Magic Valley Medical Center] on 1/15/21? That being said, St. Luke's will review its response and provide a supplementation as appropriate.**
>
> Interrogatory No. 21 asks St. Luke's to identify each and every "staff member who interacted with either Keith or Sherry Thaetea [sic], and Interrogatory No. 22 asks for each of those individuals identified, "please set forth in detail all communications they had with either Keith or Sherry Thaete." St. Luke's and Dr. Fry have not disclosed a single communication. Please provide this information.
>
> **I can't track what you are asking, as you are not clear as to which defendant you are asking information from. Your clients elected to file a lawsuit against St. Luke's *and* Dr. Fry and then served discovery on each. We have raised before that you are not being clear who you want what from. Further, your characterization ignores the medical records which have been produced. That being said, St. Luke's will review its response and provide a supplementation as appropriate.**

12

. . . .

Interrogatory No. 15 asks St. Luke's and Dr. Fry to "describe with particularity what you recall, independently of your medical records, of Sherry Thaete's hospital stay from January 15-January 17, 2021. Please specifically set forth each and every conversation, everything you did, and what you found. For this Interrogatory, "you" refers to everyone at the hospital who participated in Sherry's care, or communicated with Keith Thaete." Interrogatory No. 16 asks St. Luke's to "describe with particularity what you believe happened on January 15-January 16, 2021, during Sherry' Thaete's hospital stay, and specifically describe all conversations, what you did, and what findings you made." Defendants have not described what a single witness says they remember, or the contents of a single communication among its staff regarding the prescription error. Please respond to this request.

**You have been cautioned by the [c]ourt relative to your declaratives about having heard nothing about what anybody said and continue to ignore the medical record. Your characterization continues to ignore the medical record. Your continued refinement of the questions also flip on its head the process we have now brought up to the [c]ourt serially and that is, what medications did Keith Thaete bring to [St. Luke's Magic Valley Medical Center] on 1/15/21. That being said, my clients will review their responses and provide a supplementation as appropriate.**

. . . .

Request for Production No. 9 asks for St. Luke's to produce any standards or protocols in its possession which related to the policies and procedures for internists at its hospital. We later asked that you provide/produce information relating to the polices or procedures when an internist prescribes medication. I believe this is a reasonable request. What was Dr. Fry supposed to do to confirm this was the proper medication? St. Luke's has not produced a single document. Please produce this information.

. . . .

**First, you don't get to ask additional questions through a meet and confer. If you want to serve additional discovery as permitted by the rules, you may certainly consider doing so. Second, I disagree with your characterizations, which leads me to: Third, please read the statutes, case law and my clients' responses.**

The parties did not resolve the discovery dispute and ended the communications after the Respondents' counsel threatened to seek sanctions if the Thaetes filed a motion to compel before December 16, 2022.

The Thaetes filed their second motion to compel on February 23, 2023, seeking an order requiring the Respondents to supplement their responses to five interrogatories and one request for

production from their first and second sets of interrogatories and requests for production. The Thaetes asserted that after the court denied their first motion to compel, counsel continued efforts to resolve discovery disputes before depositions and disclosure deadlines.

The Respondents' opposition maintained that St. Luke's already supplemented its answers to two disputed interrogatories; however, the three remaining interrogatories sought privileged information. In addition, the Respondents contended that the Thaetes' request for production regarding policies and procedures for internists at St. Luke's when prescribing prescriptions was overly broad and not "described with reasonable particularity." The Respondents argued that the request for production was

> not limited to any relevant time frame [sic] or setting and could be read to include a myriad of irrelevant records having nothing to do with the subject matter of this case. The rules of discovery do not require St. Luke's to incur the time and expense to identify responsive information that is not relevant to the issues at stake in the action or to resolving matters at issue in this case.

On March 7, 2023, the hearing on the Thaetes' motion to compel evolved into an informal hearing to resolve the discovery disputes. The court granted the Thaetes' motion to compel supplemental responses to three interrogatories, along with the Thaetes' request for production with an added temporal limitation "between January 1, 2018 and January 15, 2021." Shortly after the hearing, several events occurred in rapid succession. First, the Thaetes submitted a proposed order to formalize the outcome of the motion hearing. Second, the Respondents contacted opposing counsel, stating: "Your proposed order is wrong. Please revise it immediately." Third, the Respondents filed an objection to the Thaetes' proposed order. Fourth, the district court issued the proposed order granting in part and denying in part the motion to compel the following day. The court, however, revised the proposed order. Fifth, the Respondents contacted opposing counsel again, explaining the discrepancies between the court's oral ruling and the signed order, and asserting, "Obviously [the court] made some edits to your proposed [o]rder, but I believe more are due." Sixth, the Respondents filed a motion to amend the order. They also requested a hearing on their motion.

On March 8, the Thaetes deposed Dr. Fry, and on March 14, the Thaetes deposed Nurse Victor and Nurse Brown.

On March 23, the Respondents filed a declaration of counsel in support of their motion to amend the order regarding the Thaetes' second motion to compel. The declaration included the transcript from the hearing and email correspondence between counsel.

14

On March 28, the Respondents produced St. Luke's medication ordering policy.

On April 4, the Thaetes timely filed their expert witness disclosure.

On April 10, the Respondents produced St. Luke's medication reconciliation procedure.

On April 11, the district court held a hearing on the Respondents' motion to amend the order regarding the Thaetes' second motion to compel. Three days later, the district court issued an amended order with minimal changes to the previous order.

On May 19, the Respondents deposed the Thaetes' expert witness, Dr. Dodson.

On June 1, the Respondents deposed the Thaetes' expert witness, Dr. McIlraith.

On June 7, the Thaetes filed a supplemental witness disclosure for Nurse Tripp.

On June 16, the Respondents filed a second motion to amend the scheduling order, requesting more time for St. Luke's to disclose expert witnesses. Ten days later, the district court issued a second amended scheduling order, notice of trial setting, and pretrial order, which provided the following:

**(Defendants' experts—retained or non-retained)**

1. **85** days before trial (August 7, 2023), Defendants shall disclose each person Defendants intend to call as an expert witness at trial and state the subject matter on which the witness is expected to testify.

2. **85** days before trial (August 7, 2023), Defendants shall disclose all information required by Rule 26(b)(4) of the Idaho Rules of Civil Procedure regarding expert witnesses.

3. **35** days before trial (September 26, 2023), Plaintiffs shall complete any depositions of Defendants' retained expert witnesses.

**(Plaintiffs' rebuttal experts—retained or non-retained)**

4. **64** days before trial (August 28, 2023), Plaintiffs shall disclose each person Plaintiffs intend to call as an expert Witness at trial to rebut new information or issues disclosed or raised by Defendants.

5. **64** days before trial (August 28, 2023), Plaintiffs shall disclose all information required by Rule 26(b)(4) of the Idaho Rules of Civil Procedure regarding expert witnesses.

All other deadlines remain unchanged.

On August 1, 2023, the Respondents filed their motion for summary judgment, memorandum in support of the motion, and supporting affidavit from their counsel. The summary judgment hearing was initially scheduled for September 5. On August 7, the Respondents filed their expert witness disclosure.

On August 14, the Thaetes filed a motion for extension of time. Despite their motion, the following day, the Thaetes filed a cursory opposition and supporting affidavit from their counsel. The affidavit contained attached exhibits, including transcript excerpts from the depositions of Nurses Victor and Brown, as well as Dr. Fry, Dr. Cassidy, Dr. Robison, and Mr. Thaete; a note authored by Nurse Brown in Mrs. Thaete's medical record; the Twin Falls County deputy coroner's report; portions of the Thaetes' expert witness disclosure and supplemental expert witness disclosure.

In the opposition, the Thaetes argued that the Respondents incorrectly applied the legal standard for expert qualification. They argued that courts should rely on "a measure of common sense" when determining whether an expert has actual knowledge of the relevant community standard of care. The Thaetes claimed that their experts possessed this knowledge, and, by relying on St. Luke's medication policies and the deposition testimony of multiple hospital personnel, their experts demonstrated familiarity with the relevant standard of community health care practice in Twin Falls in January 2021. In the Thaetes' view, the Respondents' witnesses, including Dr. Fry, Dr. Robison, Nurse Victor, and Nurse Brown, admitted that home medications communicated by family or presented in pill bottles should be recorded and reconciled; yet they were not. The Thaetes emphasized that the failure to document Mrs. Thaete's Nardil prescription, despite Mr. Thaete's presenting the medication to multiple providers, was a breach of the hospital's own standard of health care practice. Thus, the record contained evidence that the Respondents breached the standard of care and, therefore, summary judgment should be denied.

On August 17, the district court issued an order granting the motion for extension but rescheduled the hearing to the next available date on the court's calendar, which was September 19.

On August 28, the Thaetes subsequently filed a rebuttal expert witness disclosure, along with the declarations of Dr. McIlraith, Dr. Dodson, and Nurse Tripp. On August 29, the Thaetes filed a supplemental response to the motion for summary judgment.

On September 5, the Respondents moved to strike the Thaetes' August 28 and 29 filings. They argued that the Thaetes violated the scheduling order by submitting expert declarations after the August 22 deadline without the court's permission. They contended that the declarations were not only untimely but also introduced new standard-of-care opinions and improperly expanded the Thaetes' case-in-chief under the guise of rebuttal. Furthermore, the late filings prejudiced them by

depriving them of sufficient time to depose the experts or allow their own experts to respond before trial.

The Thaetes countered that their rebuttal filings were timely under the court's original scheduling order, which required responses to any motion for summary judgment to be filed 21 days before the motion hearing. They maintained that the filings on August 28 and 29 complied with the 21-day requirement for the new September 19 hearing date. They also claimed that the declarations directly rebut the Respondents' unexpected expert testimony, asserting that internal hospital policies, such as medication reconciliation, do not establish a standard of care. The Thaetes argued that their rebuttal experts reinforce longstanding claims that failing to document a patient's home medication, as communicated by a family member, constitutes a breach of the standard of health care. They further argued that no prejudice occurred because the opinions were consistent with prior disclosures and the Respondents had ample opportunity to depose or seek additional discovery.

The district court granted the Respondents' motion to strike the August 28 declarations of Dr. McIlraith, Dr. Dodson, and Nurse Tripp, as well as the Thaetes' August 29 supplemental response to the Respondents' motion for summary judgment. The court excluded these filings from consideration on summary judgment for three reasons: (1) they were untimely; (2) the declarations were labeled as rebuttal, which was procedurally improper for use in a dispositive motion for summary judgment; and (3) the declarations introduced new standard of care opinions that would prejudice the Respondents if admitted during the Thaetes' case-in-chief.

With the progression of the case and the contentious manner in which discovery was conducted in mind, we turn to the parties' arguments on the motion to strike.

1. *The August 17 order superseded the original scheduling order and set the operative deadline, which the Thaetes' August 28 and 29 filings violated.*

The Thaetes argue that the district court abused its discretion by not considering Dr. McIlraith's August 28 declaration and their August 29 supplemental response to the motion for summary judgment. While they acknowledge that these filings were late, they explain that the six-day delay resulted from reasonable confusion created by two overlapping court orders: (1) the original scheduling order that required the opposing party to file any response to a motion for summary judgment 21 days before the hearing on the motion, and (2) the order granting the Thaetes' motion for extension that moved the response deadline to August 22, 2023, but was premised on the earlier, September 5, hearing date. The Thaetes' counsel explained that he

believed the original scheduling order still applied when the September 5 hearing was vacated and rescheduled for September 19, and therefore their filings on August 28 and 29 were timely.

The Respondents maintain that the district court acted within its discretion under Idaho Rule of Civil Procedure 16(e)(1) when it granted the motion to strike the Thaetes' supplemental response and the August 28 declaration of Dr. McIlraith. They emphasize that the filings were untimely, in violation of a clear and unambiguous scheduling order that required all opposing affidavits and briefs to be filed by August 22—a deadline specifically requested by the Thaetes.

A trial court has the authority to sanction parties for non-compliance with pretrial orders and may exclude evidence a party has failed to disclose unless the failure was substantially justified or is harmless. I.R.C.P. 37(c)(1); *see* I.R.C.P. 16(e)(1)(A). Sanctions for discovery violations may include those enumerated in Rule 37(b)(2) of the Idaho Rules of Civil Procedure. Rule 16(a) requires trial courts to create scheduling orders early in litigation setting deadlines for parties to complete specific pretrial tasks, such as expert witness disclosures and discovery. I.R.C.P 16(a)(1), (2)(B). These deadlines "must not be modified except by leave of the court on a showing of good cause or by stipulation of all the parties and approval of the court." I.R.C.P. 16(a)(3). Rule 16(e) further grants the trial court "authority to sanction parties for non-compliance with scheduling orders, including prohibiting parties from introducing untimely disclosed evidence." *Easterling v. Kendall*, 159 Idaho 902, 910, 367 P.3d 1214, 1222 (2016) (citation omitted); *see also* I.R.C.P. 16(e), 37(b)(2)(a). It is within the district court's discretion to impose these sanctions, and this Court will not overturn that decision unless there is an abuse of discretion. *Rich v. Hepworth Holzer, LLP*, 172 Idaho 696, 713, 535 P.3d 1069, 1086 (2023).

The district court issued the original scheduling order on April 8, 2022, pursuant to Rule 16, which included deadlines for any requested disclosure of expert witnesses and the required information, as well as deadlines for dispositive motions. The scheduling order, however, did not expressly list the dates for these deadlines. Rather than setting specific calendar dates, the order calculated those deadlines relative to the trial date. For any dispositive motion, the original scheduling order required the moving party to file the motion at least 35 days before the hearing on the motion, with opposing briefs and affidavits due at least 21 days before the hearing. Furthermore, the order required that "[a]ll motions for summary judgment . . . must be filed and served so as to be heard not later than sixty (60) days before trial. . . . Exceptions will be granted infrequently, and when justice so requires."

Following the scheduling order, the Respondents filed their motion for summary judgment on August 1, 2023, with the initial hearing scheduled for September 5. Based on the September 5 hearing date, the Thaetes' deadline to file an opposing brief and affidavits was August 15. However, the district court's original scheduling order was not the operative order. The district court's August 17 order superseded that general scheduling framework by establishing a specific, date-certain deadline for responding to the summary judgment motion. The order was based on the Thaetes' motion for extension of time. The Thaetes' motion specifically requested more time "to respond to Defendant St. Luke's Motion for Summary Judgment, from August 15, 2023 to August 22, 2023, in accordance with the deadlines set forth in Idaho Rule of Civil Procedure 56(b)(2) . . . . [The Thaetes] request that the [c]ourt set the Motion for Summary Judgment hearing back one week."

The court's order granting the Thaetes' motion mirrored their request. In other words, the court ordered the Thaetes' summary judgment response to be filed no later than August 22. However, due to the court's calendar, the hearing was rescheduled for the next available date—September 19. Despite the unambiguous August 17 order, the Thaetes filed their rebuttal expert disclosures and supporting declarations on August 28, and a supplemental response to the motion for summary judgment on August 29, six and seven days late, respectively.

The Thaetes' argument that they reasonably relied on the earlier April 8 scheduling order is not persuasive. It was the Thaetes themselves who moved to extend the August 15 deadline, and their motion prompted the August 17 order imposing the August 22 deadline specifically requested by counsel. The Thaetes' failure to comply with that revised deadline renders their August 28 and 29 filings six and seven days late, respectively.

Despite this, the district court erred in granting the Respondents' motion to strike Dr. McIlraith's declaration in its entirety.

2. *The Thaetes' untimely filing of Dr. McIlraith's declaration was substantially justified and harmless, and the district court erred by excluding it; the untimely supplemental brief was neither.*

The Thaetes argue that the district court failed to apply Rule 37(c) of the Idaho Rules of Civil Procedure, which permits untimely disclosures where "the failure was substantially justified or is harmless." I.R.C.P. 37(c)(1). The Respondents challenge the Thaetes' assertion, alleging that the Thaetes failed to argue below that the late filings were harmless and therefore waived that issue on appeal. The Respondents' contention that the Thaetes waived their argument is unpersuasive.

19

"A party preserves an issue for appeal by properly presenting the issue with argument and authority to the trial court below and noticing it for hearing or a party preserves an issue for appeal if the trial court issues an adverse ruling." *Rossman Law Grp., PLLC v. Holcomb*, 176 Idaho, 549, ___, 579 P.3d 914, 920 (2025) (citation modified). The Thaetes raised the issue in their memorandum in opposition to the Respondents' motion to strike and in their memorandum in support of their motion for reconsideration. The Thaetes argued that their expert declarations were filed 21 days before the scheduled hearing, and that the Respondents were aware of the opinions expressed in the declarations, thereby rendering any delay harmless. By raising this argument below, the Thaetes preserved the issue for appellate review, and we will therefore consider the Thaetes' argument on appeal.

The Thaetes maintain that their untimely filing of Dr. McIlraith's declaration and supplemental brief was harmless and did not prejudice the Respondents, as the declaration was submitted 21 days before the hearing. The Thaetes cite two cases, *Gordon v. U.S. Bank National Ass'n*, 166 Idaho 105, 113, 455 P.3d 374, 382 (2019), and *Lepper v. Eastern Idaho Health Services, Inc.*, 160 Idaho 104, 369 P.3d 882 (2016), to support their argument that the district court abused its discretion by striking their filings due to a minor and non-prejudicial procedural error.

The Respondents counter that the Thaetes' reliance on *Gordon* is misplaced. They argue that the issue in *Gordon* was whether the district court properly shortened the time to hear a motion to dismiss, which is procedurally different from this case, where the Thaetes never filed a motion to further modify the scheduling order or briefing deadlines. However, the Respondents' narrow interpretation of the procedural context in *Gordon* mischaracterizes the Thaetes' reliance on the case and overlooks the broader principle the Thaetes cite. In the Thaetes' view, the primary purpose of procedural deadlines under Idaho Rule of Civil Procedure 56 is to ensure parties have an "adequate and fair opportunity" to respond, which they argue was met, and the court's decision to strike the filings contradicts the guidance in *Gordon*, which emphasizes fairness over rigid technical compliance.

The Thaetes cite *Lepper*, 160 Idaho at 110, 369 P.3d at 888, as an example of this Court's unwillingness to uphold harsh sanctions where a party "happen[s] to miss the mark in interpreting" vague or confusing scheduling orders. They maintain that the confusion is precisely the type of honest procedural mistake that this Court, in *Lepper*, protected against. We disagree with the Thaetes' contention that the August 17 order extending the deadline for them to file their

20

opposition to the Respondents' summary judgment motion to August 22 was confusing. We also disagree with the Thaetes' view that the earlier scheduling order created confusion. However, we agree with the Thaetes' argument that the principles expressed in *Gordon* and *Lepper* apply here, particularly in light of the Respondents' obstructive discovery strategy, which delayed the production of relevant documents and expert disclosures until late in the pretrial process.

Idaho Rule of Civil Procedure 37 provides that when a party fails to comply with a Rule 16 disclosure deadline, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." I.R.C.P. 37(c)(1).

This Court's decision in *Edmunds v. Kraner* demonstrates how these standards operate. 142 Idaho 867, 136 P.3d 338 (2006). In that case, the district court addressed whether two expert affidavits were admissible and reached a different decision on each affidavit. *See id.* at 872–75, 136 P.3d at 343–46. We affirmed the exclusion of one doctor's affidavit, which was filed more than a year after the pretrial order deadline and contained opinions different from those in the first disclosure, because the proponent had failed to use the "tools to ensure fair pretrial procedure" available under Rules 16 and 26 of the Idaho Rules of Civil Procedure. *Id.* at 873, 136 P.3d at 344. However, we reversed the exclusion of another doctor's supplemental affidavit, which expanded on earlier-disclosed opinions and was filed eight months before trial, emphasizing that Rule 26(e) imposes a continuing duty to supplement and that courts should not impose sanctions that foreclose fair opportunities to respond. *Id.* at 874–75, 136 P.3d at 345–46. This Court also cautioned against discovery orders that "give defendants every incentive to withhold information until after the plaintiff[s'] disclosure deadline has passed" and "reward the defendant[s] for stonewalling." *Id.* at 873, 136 P.3d at 344 (citation omitted).

Substantial justification and harmlessness are assessed in light of the parties' respective conduct. *See id.* at 873–75, 136 P.3d at 344–46. A party that used the tools of pretrial procedure and filed an untimely affidavit in response to the opposing party's late-produced discovery is in a different position than a party whose late filing reflects its own inattention. This Court's rationale for distinguishing between the two experts in *Edmunds* applies equally here.

First, the Thaetes used the tools of pretrial procedure persistently throughout discovery. As early as January 26, 2022, the Thaetes requested production of policies and procedures related to internists prescribing medication at St. Luke's. Unlike the plaintiffs in *Edmunds*, who did not

21

utilize the tools to ensure fair pretrial procedure with respect to the first doctor, the Thaetes used the procedural tools available under the Idaho Rules of Civil Procedure, including serving early written discovery, moving to compel withheld policies, and supplementing when the Respondents finally disclosed their expert witnesses.

Specifically, in Request for Production No. 9, the Thaetes sought "all standards, memorandums, letters, by-laws, or other such documents which relates to the policies, procedures and practices for an internist working with or at St. Luke's." When the Respondents objected that the request was overly broad, the Thaetes proposed narrowing the request to policies applicable "for internists at St. Luke's when prescribing prescriptions." When production still did not follow, the Thaetes moved to compel twice, and the second motion was granted in March 2023.

Second, it was the Respondents who delayed responding to requests for production and repeatedly obtained extensions for their own disclosure deadlines. The Respondents produced the medication ordering policy on March 28, over fourteen months after the initial request for production and only seven days before the Thaetes' April 4 expert disclosure deadline. St. Luke's medication reconciliation procedure was disclosed on April 10, six days *after* that deadline. The Respondents twice moved to extend their own expert disclosure deadlines, which the court granted, and the Respondents' experts were not disclosed until August 7, 2023, a week *after* they filed their summary judgment motion, and less than two weeks before the Thaetes' original August 15 opposition deadline. Each delay by the Respondents shortened the time available to the Thaetes to supplement their expert disclosures.

Third, like the second doctor in *Edmunds*, who was disclosed before the deadline, Dr. McIlraith was timely disclosed. The Respondents received Dr. McIlraith's April 4 disclosure more than four months before the motion to strike. They deposed him on June 1. The August 28 declaration restated those earlier-disclosed opinions and incorporated materials that had only recently been produced after prolonged discovery resistance by the Respondents. Any prejudice to the Respondents in Dr. McIlraith's declaration filed six days late was caused in large part by the Respondents' strategic conduct.

The district court's exclusion of Dr. McIlraith's August 28 declaration in its entirety rewarded the Respondents for "stonewalling," *Edmunds*, 142 Idaho at 873, 136 P.3d at 344, and the district court acted inconsistently with the applicable legal standards by not considering

whether the delay was substantially justified or harmless under Idaho Rule of Civil Procedure 37(c)(1). We hold that the delay was both.

The Thaetes' supplemental response to the Respondents' motion for summary judgment is distinguishable from Dr. McIlraith's August 28 declaration because it was an argument filed seven days after the deadline requested by the Thaetes. The Thaetes filed a timely opposition on August 15, and Dr. McIlraith's declaration presented the substantive evidentiary material in opposition to the Respondents' motion for summary judgment before the district court. Rule 37(c)(1)'s substantially justified or harmless provision does not apply to a brief that adds only argument to an existing opposition. The district court acted within its discretion in enforcing the deadline proposed by the Thaetes, and we affirm the exclusion of the August 29 supplemental response.

3. *A "rebuttal" label does not justify the wholesale exclusion of a declaration that contains timely-disclosed and properly supplemented opinions.*

The district court's second ground for exclusion was that the Thaetes designated Dr. McIlraith's declaration as rebuttal testimony and therefore could not use it to meet the case-in-chief burden for the Respondents' summary judgment motion. The Thaetes contend that the district court erred in striking Dr. McIlraith's entire August 28 declaration without distinguishing between content that was new or rebuttal and content that had already been timely disclosed. The Respondents counter that the declaration was procedurally improper because rebuttal is irrelevant at the summary judgment stage.

"To avoid summary judgment for the defense in a medical malpractice case, the plaintiff must offer expert testimony indicating that the defendant health care provider negligently failed to meet the applicable standard of health care practice." *Dulaney v. St. Alphonsus Reg'l Med. Ctr.*, 137 Idaho 160, 164, 45 P.3d 816, 820 (2002).

"Rebuttal evidence is evidence that explains, repels, counteracts or disproves evidence which has been introduced by or on behalf of the adverse party." *Van Brunt v. Stoddard*, 136 Idaho 681, 685–86, 39 P.3d 621, 625–26 (2001). Examining Dr. McIlraith's August 28 declaration paragraph by paragraph reveals three categories of evidence, none of which required wholesale exclusion: testimony that restates previously disclosed opinions, testimony that supplements those opinions with later-produced information, and testimony that refutes the Respondents' August 7 expert disclosure.

Paragraph one incorporates the April 4 disclosure by reference. Paragraphs one and three restate Dr. McIlraith's opinion that the standard of care required a hospitalist to record medication

when provided by a patient, and that Dr. Fry breached that standard when he prescribed paroxetine, which were opinions the April 4 disclosure provided four months earlier. These paragraphs are not rebuttal; instead, Dr. McIlraith's statements were necessary testimony that included timely, previously disclosed opinions that the Thaetes were required to present as evidence to avoid summary judgment.

Other portions of Dr. McIlraith's August 28 declaration rebutted later-produced material. Paragraph two responds to Dr. Farnworth's August 7 expert disclosure. Paragraphs four and five address the Joint Commission's accreditation requirements and the Respondents' medication ordering and reconciliation policies produced on March 28 and April 10, 2023. The latter of which was produced six days after the Thaetes' expert disclosure deadline. Whether those paragraphs function as supplementation or as responsive material to the Respondents' August 7 expert disclosure, they do not render the entire declaration inadmissible because the title of the filed document used the word "rebuttal."

4. *The district court erred by categorically striking Dr. McIlraith's declaration without allowing the Thaetes the opportunity to supplement their initial expert disclosure.*

The district court's third ground was that Dr. McIlraith's August 28 declaration contained new standard-of-care opinions that would prejudice the Respondents if considered as part of the Thaetes' case-in-chief. The Thaetes maintain that Dr. McIlraith's reference to the Joint Commission standards was rebuttal testimony to St. Luke's expert's opinion that the hospital's internal policies were only guidelines, not standards of care.

We recognized, in *Edmunds*, that expert testimony may be modified after the initial disclosure has been submitted. 142 Idaho at 874, 136 P.3d at 345. Idaho Rule of Civil Procedure 26 requires litigants to "supplement in a timely manner the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, and the substance of the person's testimony." I.R.C.P. 26(e)(2). This Court has held that this rule "imposes a continuing duty to supplement responses to discovery" concerning the "substance and subject matter of an expert's testimony where the initial responses have been rejected, modified, expanded upon or otherwise altered in some manner." *Edmunds*, 142 Idaho at 874, 136 P.3d at 345 (emphasis omitted) (quoting *Clark v. Klein*, 137 Idaho 154, 157, 45 P.3d 810, 813 (2002)). Supplementation is not only permitted but required, and exclusion is inappropriate where the opposing party has had adequate time and opportunity to respond. *See id.* at 875, 136 P.3d at 346.

24

Moreover, we have repeatedly cautioned against the "practice of issuing discovery orders that fail to allow plaintiffs to add witnesses in response to defendants' witness disclosures." *Phillips v. E. Idaho Health Servs., Inc.*, 166 Idaho 731, 757–58, 463 P.3d 365, 391–92 (2020) (quoting *Edmunds*, 142 Idaho at 873, 136 P.3d at 344). These orders distort the purpose of the discovery process:

> The purpose of our discovery rules is to facilitate fair and expedient pretrial fact gathering. It follows, therefore, that discovery rules are not intended to encourage or reward those whose conduct is inconsistent with that purpose. Discovery orders of the kind in this case, however, give defendants every incentive to withhold information until after the plaintiff's disclosure deadline has passed. . . . [W]e do not look favorably upon discretionary decisions by district judges that encourage last-minute witness disclosure and unreasonably prevent plaintiffs from responding, particularly in complex medical malpractice cases where experts will be furnishing the jury with the bulk of the necessary, and often technical, facts.

*Edmunds*, 142 Idaho at 873, 136 P.3d at 344.

This warning is particularly apt here, where the district court's order granting the Respondents' motion to strike barred the Thaetes from supplementing their disclosures *after* the Respondents' deadline to disclose their experts.

5. *The erroneous exclusion of Dr. McIlraith's declaration affected the Thaetes' substantial right to oppose summary judgment.*

Rule 61 of the Idaho Rules of Civil Procedure provides that "[a]t every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." I.R.C.P. 61. "A right is substantial if it could affect the outcome of litigation." *Hill v. Emergency Med. of Idaho P.A.*, 175 Idaho 439, ___, 566 P.3d 436, 444 (2025) (quoting *Martinez v. Carretero*, 173 Idaho 87, 98, 539 P.3d 565, 576 (2023)). Dr. McIlraith was the Thaetes' sole standard-of-care expert against Dr. Fry. Removing the declaration from consideration on summary judgment left the Thaetes without admissible expert evidence on essential elements of the Thaetes' prima facie case, which the Respondents' motion for summary judgment argued the Thaetes could not establish. Summary judgment was granted, and the case was dismissed. The exclusion therefore affected the Thaetes' right to oppose the Respondents' motion for summary judgment. An error that determines the outcome of the case affects a substantial right. I.R.C.P. 61.

**C. The district court erred in excluding Dr. McIlraith's testimony for lack of foundation under Idaho Code sections 6-1012 and 6-1013.**

On appeal, the Thaetes argue that the district court erred by failing to consider the straightforward nature of the standards of care at issue, Dr. McIlraith's shared board certification

25

with Dr. Fry, and the full range of sources Dr. McIlraith used to familiarize himself with the community standard—including Dr. Fry's deposition testimony and St. Luke's medication ordering policy.

Under Idaho's Medical Malpractice Act, a plaintiff who files a claim against a health care provider must affirmatively prove, through direct expert testimony, that the provider negligently failed to meet the applicable standard of health care practice that was in place at the time and location of the alleged negligence. I.C. § 6-1012; *Fisk v. McDonald*, 167 Idaho 870, 880, 477 P.3d 924, 934 (2020). Idaho Code section 6-1012 provides, in part:

> In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care, including, . . . any . . . registered nurse, . . . hospital . . . , or any person vicariously liable for the negligence of them . . . , such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided, as such standard existed at the time and place of the alleged negligence . . . with respect to the class of health care provider that such defendant then and there belonged to and in which capacity he, she or it was functioning.

I.C. § 6-1012. The health care providers are "judged in such cases in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any." *Id.*

On summary judgment, the Respondents sought to exclude the Thaetes' expert, Dr. McIlraith, arguing that his disclosure failed to establish the foundational elements required under Idaho Code sections 6-1012 and 6-1013. In particular, they asserted that Dr. McIlraith lacked actual knowledge of the applicable community standard of care, as required by Idaho Code section 6-1012, and therefore could not offer admissible testimony under section 6-1013. Without a qualified expert, the Respondents contended, the Thaetes could not establish an essential element of their claim.

This issue requires this Court to determine whether the district court erred in excluding the Thaetes' expert, Dr. McIlraith, on the ground that he lacked sufficient familiarity with the applicable community standard of health care practice. Specifically, we address whether the foundation for Dr. McIlraith's testimony—based on his board certification, review of St. Luke's medication ordering policy, and Dr. Fry's deposition testimony—satisfies the requirements of Idaho Code sections 6-1012 and 6-1013.

Before an expert may testify in a medical malpractice case as to the applicable standard of health care practice, he or she "must have actual knowledge of the community standard of care at the time and place of the alleged malpractice . . . ." *Summerfield v. St. Luke's McCall, Ltd.*, 169 Idaho 221, 229, 494 P.3d 769, 777 (2021) (citing *Fisk*, 167 Idaho at 880, 477 P.3d at 934). To introduce expert testimony, a plaintiff must satisfy specific foundational requirements, as outlined by Idaho Code section 6-1013:

> The applicable standard of practice and such a defendant's failure to meet said standard must be established in such cases by such a plaintiff by testimony of one (1) or more knowledgeable, competent expert witnesses, and such expert testimony may only be admitted in evidence if the foundation therefor is first laid, establishing (a) that such an opinion is actually held by the expert witness, (b) that the said opinion can be testified to with reasonable medical certainty, and (c) that such expert witness possesses professional knowledge and expertise coupled with actual knowledge of the applicable said community standard to which his or her expert opinion testimony is addressed[.]

I.C. § 6-1013.

An expert is not required to physically practice in the area. *See id.* ("[T]his section shall not be construed to prohibit or otherwise preclude a competent expert witness who resides elsewhere from adequately familiarizing himself with the standards and practices of" a particular area.). Rather, an out-of-area expert must "explain *how* he or she became familiar with the community standard of care." *Dlouhy v. Kootenai Hosp. Dist.*, 167 Idaho 639, 645, 474 P.3d 711, 717 (2020) (citing *Dulaney v. St. Alphonsus Reg'l Med. Ctr.*, 137 Idaho 160, 164, 45 P.3d 816, 820 (2002). We have explained that when determining whether an expert witness has actual knowledge of the applicable community standard of care:

> The guiding question is simply whether the affidavit alleges facts which, taken as true, show the proposed expert has actual knowledge of the applicable standard of care. In addressing that question, courts must look to the standard of care at issue, the proposed expert's grounds for claiming knowledge of that standard, and determine—employing a measure of common sense—whether those grounds would likely give rise to knowledge of that standard.

*Mattox v. Life Care Ctrs. of Am., Inc.*, 157 Idaho 468, 474, 337 P.3d 627, 633 (2014).

The Thaetes claim that two standards of health care practice at St. Luke's Magic Valley Medical Center in January 2021 apply in this case. One standard required internists to document a patient's new medications, and another prohibited prescribing paroxetine (Paxil) with phenelzine (Nardil). These standards, as the Thaetes argue, are the same standards that their expert, Dr. McIlraith, learned during his training to become a board-certified medical doctor (M.D.). Dr.

27

McIlraith is an internal medicine physician who works in Sacramento, California, as a hospitalist. As an out-of-area expert, Dr. McIlraith had not visited Twin Falls or St. Luke's Magic Valley Medical Center in his professional capacity.

Still, "for board-certified specialists, the local standard of care is equivalent to the national standard of care." *Dlouhy*, 167 Idaho at 646, 474 P.3d at 718 (quoting *Phillips*, 166 Idaho at 747, 463 P.3d at 381). However, this equivalency does not automatically subject the defendant to the national standard of care based on his certification. *See id.* To rely on the national standard, an out-of-area expert must meet two requirements: (1) the "expert must be board-certified in the same specialty as that of the defendant-physician," demonstrating shared knowledge of the standard of care for that specialty; and (2) the expert "must inquire" into the community standard to ensure that it does not deviate from the national standard of care that applied to the defendant specialist. *Id.* (citation modified).

Dr. Fry is a Doctor of Osteopathic Medicine (D.O.). Dr. Fry is certified by the American Osteopathic Board of Internal Medicine. Dr. McIlraith is certified by the American Board of Medicine. Both doctors hold board certification in internal medicine, though through different certifying bodies. Despite the doctors' different credentials, Dr. Fry expressly acknowledged that the standard of care for hospitalists at St. Luke's was the same regardless of their credentialing status. When asked whether the standard of care for an M.D. and a D.O. hospitalist would differ, Dr. Fry replied, "Exactly the same." Thus, the first *Dlouhy* requirement is satisfied. *See Phillips*, 166 Idaho at 750, 463 P.3d at 384.

This case turns on the second requirement, that the out-of-area expert inquire into the community standard to ensure that it does not deviate from the national standard of care. The Thaetes' expert witness disclosure, which Dr. McIlraith referenced and included in his August 28 declaration, outlined his method for gaining familiarity with the applicable standards of care. Dr. McIlraith reviewed Ms. Thaete's medical records from St. Luke's; transcripts of the depositions of Mr. Thaete, Dr. Fry, and Nurse Brown; St. Luke's internal medication ordering policy; and Mr. Thaete's notes of the events between January 15 and 16, 2021. The disclosure further explained:

> Dr. McIlraith knows the standard of care required of a hospitalist at St. Luke's Magic Valley on January 15, 2021, through his education and experience as a hospitalist in Dr. Fry's position, through Dr. Fry's own acknowledgment of the standard of care in his deposition, because he is board certified in this practice, from St. Luke's own medical reconciliation policy, because the issues at hand are

28

rudimentary standards of care required by basic training and required by our board certifications[.]

The Respondents criticize Dr. McIlraith for not consulting with any hospitalist who practices in the area that St. Luke's Magic Valley Medical Center commonly serves to familiarize himself with the community standard of care and highlight that Dr. McIlraith never practiced in Idaho. However, inquiring of a local specialist is only one method for an out-of-area expert to obtain knowledge of the community standard of care. *See Phillips*, 166 Idaho at 747, 463 P.3d at 381.

To assess whether Dr. McIlraith had the requisite foundation to testify, we examine the two principal sources for his claimed knowledge: (1) Dr. Fry's deposition testimony, and (2) St. Luke's Magic Valley Medical Center's internal medication ordering policy. Both sources described structured standards of health care practice in the Twin Falls area in 2021, which Dr. McIlraith stated align with national standards governing hospitalists like himself and Dr. Fry. In addition, we consider the simplicity of the applicable standards of care.

*1. Dr. Fry explained the community standard of care during his deposition.*

An expert may demonstrate actual knowledge of a community standard by reviewing a deposition from a local practitioner to confirm that the community standard does not vary from the national standard, provided the reviewing expert is already familiar with the national standard. *Id.* at 748, 463 P.3d at 382 (citation omitted); *see also Dlouhy*, 167 Idaho at 647–48, 474 P.3d at 719–20 (San Francisco expert, familiar with the national standard of care, confirmed via local physician's deposition that stated the only difference in practice between San Francisco and Coeur d'Alene was clothing, thereby supporting that the community and national standards of care were the same). The Thaetes argue that the district court incorrectly concluded that Dr. McIlraith's review of Dr. Fry's deposition was insufficient because the court required specific language, such as "standard of care" or "no local deviation."

The Respondents contend that Dr. Fry's deposition does not adequately inform Dr. McIlraith about the standard of care for a hospitalist because Dr. Fry did not clearly define the community standard of health care practice or indicate that the community standard differs from the national standard. However, "the key question is the quality of the sources reviewed by the expert, and whether they contain sufficient facts which, if taken as true, can support the expert's claim that he has familiarized himself with the community standard of care." *Fisk*, 167 Idaho at 883, 477 P.3d at 937. Accordingly, we look to Dr. Fry's testimony to determine whether the

testimony describes actual practices and a standard from which Dr. McIlraith could reasonably conclude that the community and national standards align.

Dr. Fry's testimony describes a structured process of medication reconciliation embedded in St. Luke's workflow that is enforced by the hospital's electronic ordering system and supported by nursing and pharmacy staff. He stated that the computer "system forces you to do the med[ication] rec[onciliation] before you sign those orders," indicating that reconciliation is mandatory. Dr. Fry further explained medication reconciliation:

| [Thaetes' Attorney:] | Tell me -- you said "med rec." Tell me what you mean, what that means, what that's short for? |
|---|---|
| [Dr. Fry:] | Medication reconciliation. |
| [Thaetes' Attorney:] | And tell me what that requires? |
| [Respondents' Attorney:] | Objection to the form. Go ahead. |
| [Dr. Fry:] | So you have the nurses who will ask what medications they are on, if they have any paper, any lists of medications. If those are provided they are entered into the computer. |
| | When we see the patient, we ask essentially the same questions. And then when we go to put our orders in, a new tab of medications have been added by the nurse, and it will force you to reconcile new medications. |
| | After those two, once the patient is admitted, the inpatient pharmacy will contact the outside pharmacies, according to my understanding, and they will get a list from that pharmacy about what has been refilled. |
| | So some patients will report being on medications that aren't accurate and maybe they take them every now and then or so. But we, but [sic] have them -- so they will report an inaccurate med rec, and the pharmacy will straighten that med rec out. |

This multilayered approach, which includes nursing entry, physician reconciliation, and pharmacy verification, demonstrates a practice designed to document accurate medication.

Dr. Fry's deposition testimony also confirmed that high-risk drug interactions—such as the one at issue in this case involving phenelzine (Nardil) and paroxetine (Paxil)—were accounted for within the medication reconciliation process. When asked if he would have prescribed Paxil had Nardil appeared in the medication history, he responded unequivocally: "Absolutely not. In fact, it would have changed the differential completely." This statement reflects an understanding that

reconciliation is designed, in part, to prevent precisely the kind of adverse drug interaction at issue here.

Dr. Fry's deposition was sufficiently descriptive for Dr. McIlraith to familiarize himself with the community standard of care regarding medication reconciliation, considering Dr. Fry's answer to the following question:

| [Thaetes' Attorney:] | What policies did St. Luke's Magic Valley have for hospitalists who were going to prescribe medications? |
| --- | --- |
| [Dr. Fry:] | To do a medication reconciliation which we did in the room. |

Dr. Fry's self-assessment that he "wasn't negligent" and "followed the standard of care," while conclusory, must be read in context. He had just described the operational systems and reconciliation procedures in detail. Thus, his assertion, though self-serving, rests on a factual foundation that illustrates what the hospital required of its hospitalists; that is, the community standard of health care practice. That description, in turn, allowed Dr. McIlraith to evaluate Dr. Fry's conduct in light of the same procedures to confirm that the standard of health care in 2021 that required internists in the community to document a patient's medication and avoid prescribing Paxil concurrently with Nardil did not vary from the national standard.

In summary, Dr. Fry's deposition described specific institutional practices for medication reconciliation, not personal or unique ones. Dr. McIlraith, as a board-certified M.D. familiar with national standards, could reasonably rely on Dr. Fry's description to confirm that the community standard—which Dr. Fry insisted he followed—did not deviate from national standards.

*2. St. Luke's medication ordering policy is consistent with Dr. Fry's testimony.*

In addition to Dr. Fry's deposition, Dr. McIlraith relied on St. Luke's internal medication ordering policy to gain knowledge of the community standard of care. Although internal policies cannot, standing alone, establish the applicable standard, they may supplement other sources to support an expert's foundation. *See Mattox v. Life Care Ctrs. of Am., Inc.*, 157 Idaho 468, 476, 337 P.3d 627, 635 (2014); *Phillips*, 166 Idaho at 748, 463 P.3d at 382. Here, St. Luke's medication ordering policy corroborates the institutional practices Dr. Fry described in his deposition and reinforces Dr. McIlraith's conclusion that St. Luke's imposed system-wide requirements that are consistent with the national standards of care.

The Respondents contend that Dr. McIlraith could not have relied on the medication reconciliation procedure because it was produced on April 10, which was six days after the

Thaetes' April 4 expert disclosure was filed, and no other declaration or deposition confirms that he reviewed the medication ordering policy. The Respondents' argument is not well taken, as it was their own obstinance in producing the policy that created the basis for their argument. It is apparent from the record that the earlier-produced medication ordering policy, disclosed on March 28, included reconciliation language. These facts support the inference that the "medication reconciliation policy" mentioned in Dr. McIlraith's disclosure is the earlier-produced medication ordering policy, not the later-produced reconciliation procedure.

The Respondents also argue that hospital policies, even when reviewed by an expert, are insufficient unless the expert demonstrates that the policy reflects actual community practices. However, Dr. Fry's deposition confirms that the medication reconciliation process in the medication ordering policy was implemented and enforced through St. Luke's electronic medical record system. Dr. McIlraith did not rely solely on the policy; he also considered Dr. Fry's deposition, including Dr. Fry's description of the required procedures combined with his statement that he complied with the standard of care, to confirm its application in the Twin Falls community in 2021.

Hospital policies or national standards may supplement but do not "serve to replace a local standard of care" when they do "not govern the actual provision of care in Idaho hospitals." *Navo v. Bingham Mem'l Hosp.*, 160 Idaho 363, 374, 373 P.3d 681, 692 (2016). This principle is exemplified in both *Fisk* and *Mattox*, where this Court evaluated the role of internal hospital policies and procedures, as well as care plans.

In *Fisk*, a case the Respondents rely on to differentiate Dr. Fry's testimony, the expert offered the hospital's internal policies as the basis for forming his opinion that the American Nurses Association (ANA) standards were the same as the community standard of care. 167 Idaho at 881–82, 477 P.3d at 935–36. Those policies provided, "It is the policy of the hospital to utilize the ANA's standards of practice based on the nursing process." *Id.* at 882, 477 P.3d at 936. On appeal, the Court recognized that is has "never held that a hospital's internal policies, standing alone, were sufficient to allow an expert to ensure that the community standard of care does not deviate from the national standard. Nor are we prepared to do so based on the internal policies discussed in [the expert's first] declaration." *Id.* We reasoned that it was not immediately clear from the policy statement whether the ANA standards had become the community standard of care. *Id.* "It could be that the [h]ospital only intended to supplement the community standard of

care with the ANA's standards of practice. Or the [h]ospital may have the policy statement as a form of aspirational goal for its nurses." *Id.* We concluded that the district court did not abuse its discretion in determining that the expert's first declaration was inadmissible at the summary judgment stage. *Id.* at 883, 477 P.3d at 937.

However, we continued to explain "[t]hat is not to say that the [h]ospital's policy statement cannot help inform [an expert's] understanding of the community standard of care, but it does not provide enough on its own to determine whether the ANA standards were the community standard of care." *Id.* at 882, 477 P.3d at 936; s*ee also Kozlowski v. Rush*, 121 Idaho 825, 830, 828 P.2d 854, 859 (1992) (concluding that an out-of-area expert's testimony was supported by sufficient foundation when the expert testified that he was familiar with a national standard of care and had reviewed the deposition of a doctor who practiced in the same area as the defendant which stated that the community standard was the same as the national standard "with one irrelevant exception").

The Court determined that the district court erred in concluding that testimony from one of the patient's three experts was inadmissible at the motion for reconsideration stage. *Fisk*, 167 Idaho at 894, 477 P.3d at 948. We explained that the expert's two declarations together demonstrate that the expert "reviewed the depositions of four local healthcare providers, along with the [h]ospital's internal policy statements to familiarize himself with the community standard of care." *Id.* at 893, 477 P.3d at 947. Specifically, the expert's "first declaration contained numerous statements of the applicable standards of care." *Id.* The expert's second declaration, submitted on reconsideration, explained in detail "how he familiarized himself with the community standard of care" and provided "facts from the sources he reviewed to demonstrate that the ANA standards of practice, which he was familiar with, had been adopted as community standards of care." *Id.* at 472, 337 P.3d at 631.

In *Mattox*, the plaintiff's physician expert, who was also the patient's primary care physician, opined that the skilled nursing facility breached the standard of care by failing to follow his direct medical orders and the facility's own care plan, both of which addressed how to physically prevent resident falls. 157 Idaho at 472, 337 P.3d at 631. A nurse expert similarly cited, among other sources, the facility's care plan specifically developed for the patient. *Id.* at 479, 337 P.3d at 638. The care plan outlined a list of precautions aimed at preventing injury from a fall, including "the use of bed rails, a bed set to its lowest position, the use of hip protectors, and the

observation of a regular check and change schedule." *Id.* She supported her opinion by reviewing those documents, analyzing state and federal regulations, and conducting interviews with four local professionals. *Id.* at 472, 337 P.3d at 631.

On appeal, this Court held that both experts' opinions were admissible, reasoning that the care plans that address how fall prevention was physically administered, such as specific safety measures, were relevant indicators of the applicable standard of care if the experts could demonstrate that those care plans reflected local practices. *See id.* at 475–76, 337 P.3d 627, 634–35. The facility's care plan and the primary care physician's medical order were detailed policies used to deliver daily care, not generic administrative regulations. *See id.*

Turning back to this case, St. Luke's medication ordering policy defines "medication reconciliation" as "intended to identify and resolve discrepancies –it is a process of comparing the medications a patient is taking (or should be taking) with newly ordered medications. The comparison addresses duplication, omissions, interactions and the need to continue current medications." The policy's stated purpose emphasizes that St. Luke's "provides effective medication management systems in compliance with law, regulation, and evidence-based practice, to support patient safety and improve the quality of care." The policy further explains that "[t]he provider is responsible for evaluating the home medications/ordering medications for the patient conditions." These provisions align with the practices Dr. Fry described and are consistent with national hospitalist standards for documenting a patient's current medications, on which Dr. McIlraith, a board-certified internal medicine physician, is trained.

Moreover, the policy defines a "medication error" as

any preventable [adverse drug event] that may cause or lead to inappropriate medication use or harm while the medication is in the control of the health care professional, patient or consumer. These errors include: *prescribing errors* (wrong drug, wrong dose etc.), omission errors (missed dose), wrong time error, wrong patient, wrong dose form, administration of an expired drug, and wrong drug preparation.

(Emphasis added). Although the policy does not name phenelzine (Nardil) and paroxetine (Paxil) specifically, it denotes an expectation that medications with potential for preventable adverse drug events, such as prescribing the wrong drug that may cause harmful interactions, must be identified and addressed before prescriptions are ordered. This expectation is echoed in Dr. Fry's deposition, where he stated that knowledge of a patient's use of Nardil would have completely altered his decision to prescribe Paxil.

Unlike the aspirational policy statement described in the expert's first declaration in *Fisk*, the medication ordering policy in this case addresses the delivery of care at a granular, operational level. It applies across all of St. Luke's facilities, including St. Luke's Magic Valley Medical Center, and governs "[a]ll Personnel working, practicing, or performing services" for all patient populations. Dr. Fry's own testimony showed that St. Luke's medication ordering policy's system-wide application and specificity reinforce that the policy describes actual, not aspirational, institutional practices. Like the care plan and the physician's medical orders in *Mattox*, the medication ordering policy in this case addresses daily procedures and safety measures that guide how providers document, order, and administer medication. Dr. Fry's description of the reconciliation process, using nearly identical language, reinforces that this process was the community standard of care that applied in the Twin Falls area in 2021.

Our decision in *Fisk* is helpful in two ways. First, this case is distinguishable from *Fisk*, where the expert's first declaration submitted on summary judgment depended solely on a hospital's general policy statement that incorporated ANA standards without demonstrating that those standards had been adopted or used in practice. 167 Idaho at 881–82, 477 P.3d at 935–36. In contrast, the medication ordering policy here details how providers document, order, and administer medication at St. Luke's. Second, like the expert's two combined declarations on a motion for reconsideration in *Fisk*, Dr. McIlraith's declaration demonstrated that he "reviewed the depositions of . . . local healthcare providers, along with the [h]ospital's internal policy statements to familiarize himself with the community standard of care." *See id.* at 893, 477 P.3d at 947. The two sources allowed Dr. McIlraith to confirm that the community standards of care applicable in 2021 were the same as, or did not deviate from, the national standard.

3. *The applicable standards of care are not complicated.*

The requirement placed on out-of-area experts to demonstrate how they became familiar with the standard of care in that community "is not intended to be 'an overly burdensome requirement.'" *Mattox*, 157 Idaho at 474, 337 P.3d at 633 (citation modified) (quoting *Frank v. E. Shoshone Hosp.*, 114 Idaho 480, 482, 757 P.2d 1199, 1201 (1988)). In that vein, we have explained in numerous recent cases that while "the proffered expert must meet minimum requirements as a prerequisite to admission of that expert's opinion[,]" specific "magic language" is not "required to demonstrate the requisite familiarity with the applicable standard of" care. *See, e.g.*, *Samples v. Hanson*, 161 Idaho 179, 183, 384 P.3d 943, 947 (2016); *see also Fisk*, 167 Idaho at 882–83, 477

P.3d at 936–37 (collecting cases explaining that no magic language is required); *Mattox*, 157 Idaho at 473–74, 337 P.3d at 632–33 (explaining that a particular phrase or statement in a "formulaic manner" is not required to establish adequate foundation).

This Court's decision in *Samples* demonstrates how the applicable standard of care influences the foundation required under Idaho Code section 6-1013. In that case, a patient underwent a cholecystectomy by a gastroenterologist in Blackfoot. 161 Idaho at 181, 384 P.3d at 945. During the surgery, the doctor tore the patient's colon, leading to sepsis and respiratory distress. *Id.* The patient was transferred to another hospital in Pocatello, where a second surgeon discovered the infection. *Id.* The patient sued both the Blackfoot hospital and the gastroenterologist. *Id.* The district court granted summary judgment on the ground that the second surgeon, who also served as the patient's expert, failed to establish actual knowledge of the Blackfoot standard of care, reasoning that the expert had not consulted a local physician and had not otherwise inquired into local practice in 2009. *Id.* at 183, 384 P.3d at 947.

On appeal, this Court reversed after evaluating the expert's affidavit using the framework that "courts must look to the standard of care at issue, the proposed expert's grounds for claiming knowledge of that standard, and determine—employing a measure of common sense—whether those grounds would likely give rise to knowledge of that standard." *Samples*, 161 Idaho at 185, 384 P.3d at 949 (quoting *Mattox*, 157 Idaho at 474, 337 P.3d at 633). While the Court clarified that the case did not require an out-of-area doctor to consult a local physician, as the second surgeon was not an out-of-area expert, the Court identified an additional reason the foundation was adequate. *Id.* The Court emphasized that the applicable standard of care was "not a complicated standard of care." *Id.* at 186, 384 P.3d at 950. The expert described basic practices, including staying with a post-surgical patient, monitoring blood work for signs of infection, administering appropriate antibiotics, and reopening the surgical site when sepsis is suspected. *Id.* at 185–86, 384 P.3d at 949–50. The court emphasized the expert's statement that the "standard of care is universal" for "any surgeon" and noted it was "largely a matter of common sense." *Id.* The standard did not require "detailed specialization, intricate treatments, expensive equipment, or detailed knowledge of drug interactions." *Id.* at 186, 384 P.3d at 950. The Court concluded that "any surgeon, regardless of" location should recognize infection indicators. *Id.*

Against this background, we repeat: "courts must look to the standard of care at issue" in addition to the proposed expert's basis for asserting knowledge of the applicable standard of care.

*Id.* at 185, 384 P.3d at 949; *see also Grover v. Smith*, 137 Idaho 247, 253, 46 P.3d 1105, 1111 (2002) (taking a patient's health history is "a basic, elementary standard to become licensed as a dentist in Idaho"); *Summerfield v. St. Luke's McCall, Ltd.*, 169 Idaho 221, 231, 494 P.3d 769, 779 (2021) (disclosure and documentation of a surgical error in the medical chart were standards of "such a general nature that" an emergency medicine physician was qualified to opine on them).

Dr. McIlraith's declaration identified two applicable community standards of care in the Twin Falls area in 2021: first, that internists must document a patient's current medications, and second, that Paxil must not be prescribed concurrently with Nardil. Like the standards of care applicable in *Samples* and *Summerfield* that did not require complex equipment or procedures, the standards asserted by Dr. McIlraith are not complicated. Dr. McIlraith's opinion on the applicable standard of care aligns with the practices described by Dr. Fry and St. Luke's policy. Dr. Fry testified that he would never prescribe Paxil to a patient taking Nardil, and St. Luke's medication ordering policy requires documentation of medications. The simplicity of these standards further supports Dr. McIlraith's assertion of actual knowledge. To be clear, however, the emphasis on the straightforward standards of care in this case is not intended as a substitute for the requirement that an out-of-area expert inquire into the community standard to ensure that it does not deviate from the national standard of care. Rather, the simplicity of the standard of care is an additional factor for courts to consider.

4. *Dr. McIlraith's board certification, review of sources, and the straightforward nature of the standards at issue together established actual knowledge of the community standard of care.*

We hold that Dr. McIlraith's inquiry was sufficient to familiarize himself with the community standards of care in the Twin Falls area in January 2021. Dr. McIlraith demonstrated actual knowledge of the community standard by reviewing Dr. Fry's deposition testimony and St. Luke's internal medication ordering policy. His review, together with the straightforward nature of the relevant standards—documenting and avoiding contraindicated medications—provided sufficient facts to establish that Dr. McIlraith ensured the community standards did not deviate from the applicable national standards.

Dr. McIlraith and Dr. Fry share a board certification in internal medicine. This demonstrates a shared knowledge of the standard of care for that specialty, which satisfied the first *Dlouhy v. Kootenai Hospital District* element. *See* 167 Idaho 639, 646, 474 P.3d 711, 718 (2020). The second *Dlouhy* element required Dr. McIlraith to inquire into the community standard to

37

ensure that it does not deviate from the national standard that applied to Dr. Fry. *See id.* In this regard, Dr. McIlraith reviewed Dr. Fry's deposition and St. Luke's medication ordering policy. Dr. Fry's deposition described the community standard of care and confirmed he was required to follow it. St. Luke's medication ordering policy documented that same practice as an institutional requirement. Finally, the simplicity of the standards means that the combination, viewed "employing a measure of common sense," *Mattox*, 157 Idaho at 474, 337 P.3d at 633, supports Dr. McIlraith's claim that he familiarized himself with the community standard of care.

The dissent's analysis is too granular. The analysis parses each source Dr. McIlraith reviewed, views each in isolation, and then faults each for failing to independently establish the applicable standard of care. Our case law does not require that every source an out-of-area expert reviews, standing alone, inform the expert of the community standard of care. Instead, it is worth repeating, "the key question is the quality of the sources reviewed by the expert, and whether they contain sufficient facts which, if taken as true, can support the expert's claim that he has familiarized himself with the community standard of care." *Fisk*, 167 Idaho at 883, 477 P.3d at 937. Stated another way, the sources reviewed by the out-of-area expert must provide enough facts regarding the community standard of care, such that the reviewing expert can rely on those sources to assess conformity with or deviation from the national standard.

Accordingly, we hold that Dr. McIlraith possessed a sufficient foundation to offer expert testimony under Idaho Code sections 6-1012 and 6-1013. The district court erred when it excluded Dr. McIlraith as an expert witness. As explained in Section B.5, the exclusion affected the Thaetes' substantial right to oppose summary judgment.

**D. The district court did not err in concluding that Nurse Chisum's expert disclosure did not include an opinion that St. Luke's nurses breached the standard of care.**

The Thaetes argue the district court erred in excluding Nurse Chisum's testimony because the substance and context of her expert disclosure showed she believed the nurses breached the standard of care, even though the disclosure never used that word.

The district court concluded that Nurse Chisum's expert testimony was inadmissible at trial because her expert disclosure did not expressly state that any St. Luke's nurses breached the applicable community standard of care. Although the court acknowledged that Nurse Chisum's disclosure referenced her agreement with testimony from Nurses Brown and Victor regarding the standard of care in the Twin Falls area in 2021, the court determined that her disclosure did not include any opinion addressing breach. As a result, the court concluded that without admissible

expert testimony, the Thaetes could not meet their burden to establish the prima facie element of breach in a negligence claim against St. Luke's nursing staff.

On reconsideration, the court reaffirmed its conclusion. The court determined that the Thaetes failed to disclose any breach opinion from Nurse Chisum in their initial or rebuttal expert disclosures and had not timely supplemented the record with a declaration to that effect. The court also cited representations by the Thaetes' counsel that Nurse Chisum was unwilling to testify at trial, which undermined their subsequent argument that she should have been permitted to testify. Ultimately, the court held that the requirements of Idaho Rule of Civil Procedure 26(b)(4), as well as the deadlines outlined in the amended scheduling order, had not been met.

Under Rule 26 of the Idaho Rules of Civil Procedure, a party must disclose the identity of any expert witness expected to testify, either in response to interrogatories or as required by court order. I.R.C.P. 26(b)(4)(A). Rule 26 contains a detailed list of the information that parties must disclose for expert witnesses, if requested by interrogatory or court order. *See* I.R.C.P. 26(b)(4)(A)(i). This rule "was designed to promote candor and fairness in the pre-trial discovery process." *Westby v. Schaefer*, 157 Idaho 616, 623, 338 P.3d 1220, 1227 (2014) (quoting *Radmer v. Ford Motor Co.*, 120 Idaho 86, 89, 813 P.2d 897, 900 (1991)).

Disclosure requirements under Rule 26 and admissibility requirements under Idaho Code sections 6-1012 and 6-1013 serve different purposes. *See Lepper v. E. Idaho Health Servs., Inc.*, 160 Idaho 104, 109, 369 P.3d 882, 887 (2016) ("Idaho Code sections 6-1012 and 6-1013 apply to the admissibility of expert witness testimony for trial, not to disclosures in the discovery stages of a case."). While the result is the same under either the disclosure or admissibility requirement, our focus on appeal is limited to whether the district court erred in concluding that Nurse Chisum was not disclosed to testify that St. Luke's nurses breached the standard of care.

The Respondents served the Thaetes with interrogatories requesting the identity, opinions, and all information required by Idaho Rule of Civil Procedure 26(b)(4), as well as the identity of any physician or healthcare provider with whom the Thaetes' expert consulted to become familiar with the applicable community standard of health care practice. The Thaetes responded: "Plaintiffs object . . . because it seeks information protected by the attorney client privilege, the attorney work product doctrine, and because it is premature. Witnesses will be disclosed in accordance with the [c]ourt's scheduling order."

Pursuant to the district court's June 6 amended scheduling order, the Thaetes' deadline to disclose expert witnesses and "all information required by Rule 26(b)(4)" was 210 days before trial, or April 4, 2023. On April 4, 2023, the Thaetes timely disclosed three retained expert witnesses, including Nurse Chisum, a registered nurse who was employed by St. Luke's between 2020 and 2021. The disclosure stated Nurse Chisum's educational background, employment history, and materials reviewed, including "[Nurse] Chisum has reviewed the deposition transcripts of Nurses Brown and Victor, the medical reconciliation policy from St. Luke's, and Sherry Thaete's medical records from June 15-17, 2021. Nurse Chisum will review deposition transcripts of other staff when they are made available, and this disclosure will be supplemented." The disclosure further included the opinions that Nurse Chisum would offer:

> [Nurse] Chisum agrees with Nurses Brown and Victor, and the medical reconciliation policy at St. Luke's, that when a patient or her husband provide a prescribed medication, especially in the bottle, to the nurse, that information should be entered into the medical record, particularly if it is not already noted. This is a general tenet of nursing practice, applicable to all registered nurses, that if a patient or her husband provide verification of a home medication, that information should be noted in the medical record. This is the standard of care in nursing, and Nurses Brown and Victor confirmed it was the standard of care at St. Luke's Magic Valley in January 2021. [Nurse] Chisum holds this opinion to a reasonable degree of medical certainty.

The disclosure did not state that any St. Luke's nurse was presented with a pill bottle and failed to act, did not identify the care actually provided to Mrs. Thaete, and did not state Nurse Chisum's opinion that any nurse breached the standard. Identifying the applicable standard of care and asserting that a party breached that standard are distinct opinions; the former describes the conduct required, the latter describes the defendant's failure to meet it. The district court's conclusion that the disclosure omitted a breach opinion was therefore correct, and the court did not err in declining to draw that inference from the surrounding context.

On appeal, the Respondents raise an alternative argument that an unsworn expert disclosure prepared by counsel, unaccompanied by a sworn declaration from the expert, cannot be used to oppose summary judgment. That argument may have force, *see Dlouhy*, 167 Idaho at 648–49, 474 P.3d at 720–21, but the Respondents did not raise it below. We do not consider arguments raised for the first time on appeal. *Alpha Mortg. Fund II v. Drinkard*, 169 Idaho 446, 449–50, 497 P.3d 200, 203–04 (2021). Because we affirm the exclusion on the ground that the district court actually decided, we need not reach the argument the Respondents raise for the first time here.

We affirm the district court's decision to exclude Nurse Chisum's testimony.

**E. The district court erred when it granted summary judgment in favor of Dr. Fry.**

The district court's decision to grant the Respondents' motion for summary judgment rested entirely on its conclusion that the Thaetes lacked admissible expert testimony. The court determined that Dr. McIlraith's opinions were inadmissible for lack of foundation. Without testimony from Dr. McIlraith, the court concluded that the Thaetes could not establish a prima facie case.

This reasoning no longer applies to Dr. Fry. As explained in Section B, Dr. McIlraith's August 28 declaration should not have been stricken. Section C further establishes that Dr. McIlraith had an adequate foundation under Idaho Code sections 6-1012 and 6-1013 to offer a standard-of-care opinion. The Thaetes have provided admissible expert testimony asserting that the community standard of care required a hospitalist to document a patient's home medications and prohibited prescribing paroxetine (Paxil) and phenelzine (Nardil) together, and that Dr. Fry breached these standards. Viewing the record in a light most favorable to the Thaetes, a genuine dispute of material fact exists regarding the standard of care and breach as to Dr. Fry. We therefore reverse the grant of summary judgment with respect to Dr. Fry.

**F. Neither party is entitled to attorney fees on appeal, but the Thaetes are entitled to costs.**

The final issue is whether the Respondents are entitled to attorney fees on appeal. The Thaetes do not request attorney fees or costs. The Respondents request attorney fees under Rules 11.2 and 41(a) of the Idaho Appellate Rules, as well as Idaho Code section 12-121, and they also request costs under Idaho Appellate Rule 40.

Under Idaho Code section 12-121, this Court may award reasonable attorney fees to the prevailing party when the appeal "was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. Likewise, Idaho Appellate Rule 11.2 applies "under the same circumstances that warrant awards under Idaho Code section 12-121." *Bergeman v. Select Portfolio Serv.*, 164 Idaho 498, 503, 432 P.3d 47, 52 (2018); *see also Akers v. Mortensen*, 160 Idaho 286, 289–90, 371 P.3d 340, 343–44 (2016) (awarding attorney fees under both Idaho Code section 12-121 and Idaho Appellate Rule 11.2 for the same conduct).

The Thaetes raised legitimate issues on appeal regarding the district court's decisions, and some of those legal challenges ultimately led to a different result. The Thaetes did not pursue the appeal frivolously, unreasonably or without foundation; therefore, the Respondents are not entitled

to attorney fees on appeal under either Idaho Code section 12-121 or Idaho Appellate Rule 11.2. The Thaetes are entitled to costs on appeal under Rule 40(a).

## V.    CONCLUSION

The amended judgment is vacated, and the case is remanded for further proceedings consistent with this opinion. The order granting the Respondents' motion to strike is affirmed as to the Thaetes' August 29 supplemental response and reversed as to Dr. McIlraith's declaration. The order granting summary judgment is reversed as to Dr. Fry but affirmed as to St. Luke's. Neither party is awarded attorney fees on appeal. The Thaetes are awarded costs as the prevailing party.

Chief Justice BEVAN, and Justices MOELLER and BURDICK, J. Pro Tem, CONCUR.


ZAHN, J., dissenting.

I fully concur in Sections IV.A and IV.D of the majority opinion, which hold that: (1) the late notice of appeal served upon opposing counsel by Keith Thaete, Steve King, and Lance Thaete (collectively, "the Thaetes") is not a jurisdictional defect that requires dismissal of this appeal; and (2) the district court did not err in concluding that Nurse Camille Chisum's expert disclosure did not include an opinion concerning breach the standard of care. I also concur in that part of Section IV.B.2 holding that the district court did not err in striking as untimely the Thaetes' August 29 supplemental memorandum in opposition to the Respondents' motion for summary judgment.

However, I respectfully dissent from the remainder of the majority opinion, which holds that: (1) the district court erred in striking the Thaetes' August 28 Declaration of Dr. Thomas McIlraith as untimely; and (2) the district court erred in granting summary judgment and dismissing the Thaetes' claims. As discussed below, these holdings are in contravention of the Idaho Rules of Civil Procedure, Idaho's medical malpractice statutes, and this Court's caselaw.

**A. The district court did not abuse its discretion when it struck the Declaration of Dr. McIlraith because it was filed after the deadline set by the district court.**

St. Luke's Magic Valley Medical Center and Dr. Michael Fry's (collectively "St. Luke's") motion to strike the Thaetes' supplemental summary judgment materials identified three different bases for striking Dr. McIlraith's declaration filed on August 28: (1) it was untimely because it was filed after the August 22 deadline identified in the district court's order granting the Thaetes' motion to continue; (2) it included new expert opinions that were not disclosed by the deadline

identified in the court's scheduling order; and (3) it contained rebuttal opinions that could not be relied upon to oppose summary judgment.

The district court agreed with St. Luke's and relied on all three arguments to strike Dr. McIlraith's declaration. We review the district court's decision sanctioning the Thaetes for an abuse of discretion. *Krinitt v. Idaho Dep't of Fish & Game*, 162 Idaho 425, 429, 398 P.3d 158, 162 (2017) (reviewing a trial court's decision to impose sanctions under Idaho Rule of Civil Procedure 16(i)); *Petersen v. Millennial Dev. Partners, LLC*, 175 Idaho 511, ___, 567 P.3d 780, 785 (2025) (reviewing district court's decision imposing sanctions under Rules 16(i) and 37(b)(2)(C)). Before sanctioning a party, the trial court must (1) balance the equities between the disobedient party and the innocent party, and (2) "consider whether lesser sanctions would be effective." *Erickson v. Erickson*, 171 Idaho 352, 362, 521 P.3d 1089, 1099 (2022) (quoting *Noble v. Ada Cnty. Elections Bd.*, 135 Idaho 495, 499–500, 20 P.3d 679, 683–84 (2000)).

Given the three alternative, independent bases for granting the motion to strike, the Thaetes must establish that the district court abused its discretion on all three grounds. *See Andersen v. Prof'l Escrow Servs., Inc.*, 141 Idaho 743, 746, 118 P.3d 75, 78 (2005) ("When a decision is 'based upon alternative grounds, the fact that one of the grounds may be in error is of no consequence and may be disregarded if the judgment can be sustained upon one of the other grounds.'" (quoting *MacLeod v. Reed*, 126 Idaho 669, 671, 889 P.2d 103, 105 (Ct. App. 1995))).

While the majority opinion addresses all three grounds, it erroneously conflates two different legal standards to conclude that the district court erred. Put simply, the "substantially justified and harmless" standard does not apply when determining whether to strike a document as a sanction pursuant to Rule 16(e) because it was filed in violation of a pretrial order. When the Rule 16(e) standard is applied, it is clear that the district court did not abuse its discretion when it struck the August 28 declaration because it was filed after the August 22 deadline set by the district court.

To be clear, St. Luke's asserted several arguments for striking the August 28 declaration of Dr. McIlraith. The majority opinion erroneously conflates the legal standards applicable to two of those arguments. The first argument was that *the declaration itself* was filed after the court-imposed August 22 deadline. The second argument was that *the declaration contained new expert opinions* that had not been disclosed by the deadline contained in the court's second amended scheduling order. The two arguments are governed by different rules.

43

The first argument is governed by Rule 16(e). Rule 16(e)(1)(A) permits the court to sanction a party if it "fails to obey a scheduling or pretrial order[.]" I.R.C.P. 16(e)(1)(A). If a party fails to obey a pretrial order, "[t]he court may make such orders as are just, and may, along with any other sanction, *make any of the orders allowed under Rule 37(b)(2)(A)*." I.R.C.P. 16(e)(2) (emphasis added). Available sanctions under Rule 37(b)(2)(A) include striking the pleading in whole or in part. I.R.C.P. 37(b)(2)(A)(iii).

The second argument is governed by Rule 37(c)(1), which concerns when a party may use late-disclosed information in discovery, including late-disclosed expert opinions:

> If a party fails to supplement discovery responses when required or fails to comply with a disclosure requirement ordered by the court pursuant to a Rule 16 scheduling or pre-trial order, the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

I.R.C.P. 37(c)(1).

The majority opinion erroneously applies the second standard, the Rule 37(c)(1) standard, to analyze the first argument—that the declaration should be struck because it was filed in violation of the court's pretrial order. Rule 37(c)(1), however, does not apply to such violations. Instead, it applies to late-disclosed discovery, including late-disclosed expert opinions. Put differently, *whether to strike a document* because it was filed after a court-ordered deadline in a pretrial order is a different question than *whether to strike an expert opinion* because it was disclosed after the court-ordered disclosure deadline contained in a scheduling order. The differences between Rule 16 and Rule 37(c)(1) matter here. Imposition of sanctions under Rule 16(e) does not involve an analysis of whether the failure to obey a pretrial order was substantially justified or harmless, but the decision whether to allow a party to rely on a late-disclosed expert opinion does.

When the correct rule is applied, it is clear that the district court acted within its discretion when it struck the August 28 declaration because it was filed late. The district court's order granting the Thaetes' motion to continue was a pretrial order. It set a deadline of August 22 for the Thaetes to submit any filings in opposition to St. Luke's motion for summary judgment. The Thaetes filed their supplemental opposition materials after that deadline. As a result, the district court was authorized to sanction the Thaetes by striking their untimely pleadings under Rules 16(e) and 37(b)(2)(A). The district court did not abuse its discretion when it struck the August 28 declaration of Dr. McIlraith pursuant to Rule 16(e).

44

In its oral ruling striking the pleadings, the district court balanced the equities between the Thaetes and St. Luke's, and determined that lesser sanctions would not be effective. The court determined that the Thaetes requested the filing deadline of August 22 but failed to file their pleadings by that deadline. Instead, they filed their pleadings almost a week late without seeking leave of the court. The court further noted that allowing the Thaetes to rely on the late filings, which contained previously undisclosed expert opinions, would cause substantial prejudice to St. Luke's. Finally, the court stated that it had considered all alternatives to striking the late pleadings and recognized that its decision was discretionary. The court then indicated that it was exercising its discretion to strike the Thaetes' pleadings as a sanction for their failure to comply with the August 22 deadline.

The majority opinion errs by applying the Rule 37(c)(1) standard to the district court's decision to strike the pleading as a sanction pursuant to Rule 16(e). For the reasons discussed above, that standard did not apply to the first basis for the district court's decision. Because the district court did not abuse its discretion in striking the declaration pursuant to Rule 16(e), the district court's decision can be affirmed on that basis alone. *See Andersen*, 141 Idaho at 746, 118 P.3d at 78. For unknown reasons, the majority opinion correctly cites Rule 16(e) to affirm the decision striking the Thaetes' supplemental memorandum but then erroneously applies the standard from Rule 37(c)(1) to reverse the decision striking Dr. McIlraith's declaration. Rule 16(e) applies to both decisions, and because the district court correctly applied the rule to both decisions, they should both be affirmed. I therefore respectfully dissent from Section IV.B of the majority opinion.

**B. The district court did not abuse its discretion when it concluded that Dr. McIlraith's expert opinion was inadmissible because the Thaetes failed to establish the required foundation.**

While the district court did not err in striking the Thaetes' untimely August 28 and 29 summary judgment filings, the Thaetes had timely filed summary judgment opposition materials on August 15. The district court properly considered them in connection with St. Luke's summary judgment motion. The timely-filed materials included a declaration of counsel. Attached to the declaration of counsel was a copy of Dr. McIlraith's expert witness disclosure and four pages from Dr. Fry's deposition. After considering these materials, the district court concluded that Dr. McIlraith's expert opinion was inadmissible because he failed to adequately establish that he was familiar with the local standard of care. Specifically, the district court determined that St. Luke's

45

policies could not establish the community standard of care and Dr. Fry's deposition testimony did not clearly articulate the community standard of care.

The majority opinion holds that the district court erred in concluding that Dr. McIlraith's declaration was inadmissible. This holding is erroneous for two reasons. First, it relies on the information contained in Dr. McIlraith's August 28 declaration. For the reasons previously discussed, the district court did not abuse its discretion in striking the declaration and therefore it should not be considered when reviewing the district court's decision that Dr. McIlraith's expert opinion was inadmissible. Second, the majority opinion fails to analyze the district court's decision under the four-prong abuse of discretion standard of review, which is the standard this Court applies when reviewing a district court's evidentiary decisions. *Phillips v. E. Idaho Health Servs., Inc.*, 166 Idaho 731, 741, 463 P.3d 365, 375 (2020). While the majority may have reached a different result had it been sitting in the trial court's shoes, that does not establish the trial court abused its discretion. I would hold that the district court's decision satisfies all four prongs of the abuse of discretion inquiry and affirm its decision on that basis.

The district court concluded that Dr. McIlraith could not rely on Dr. Fry's deposition testimony to familiarize himself with the community standard of care because Dr. Fry failed to clearly articulate the community standard of care or otherwise indicate that the community standard was equivalent to the national standard of care. The district court based its conclusion, in part, on this Court's decision in *Suhadolnik v. Pressman*, 151 Idaho 110, 254 P.3d 11 (2011), which discussed when an out-of-area expert may rely on deposition testimony to familiarize himself with the community standard of care:

> Although the Court acknowledged [in *Rhodehouse v. Stutts*, 125 Idaho 208, 212, 868 P.2d 1224, 1228 (1994),] that [a review of another doctor's deposition] *might* provide an adequate foundation for an expert's knowledge of the local standard of care, it found the deposition in that case to be insufficient because the deposition "never stated that the local standard of care was the same as the national standard, nor in fact did [the defendant-doctor] make any direct reference to the local standard of care." Therefore[,] while it may be acceptable for an expert to demonstrate knowledge of a local standard of care by reviewing deposition testimony, that testimony must clearly articulate the local standard for the particular time, place and specialty at issue in order to meet the foundational requirements of [Idaho Code section] 6-1013.

*Suhadolnik*, 151 Idaho at 117–18, 254 P.3d at 18–19 (third alteration in original) (underlined emphasis added) (footnote omitted). In the years since our decision in *Suhadolnik*, this Court has reiterated that, to form the foundation for an expert's knowledge of the community standard of

46

care, another doctor's deposition testimony must "clearly articulate" the community standard for the particular time, place and specialty at issue. *See Rich v. Hepworth Holzer, LLP*, 172 Idaho 696, 711, 535 P.3d 1069, 1084 (2023) (citation omitted); *Phillips*, 166 Idaho at 748, 463 P.3d at 382 (citation omitted).

The majority opinion does not address this caselaw or articulate how the district court abused its discretion by relying on it to conclude that Dr. Fry's deposition testimony did not provide an adequate foundation for Dr. McIlraith's knowledge of the community standard. Instead, the majority opinion asserts that "the key question is the quality of the sources reviewed by the expert, and whether they contain sufficient facts which, if taken as true, can support the expert's claim that he has familiarized himself with the community standard of care." Majority Op., *supra* at 30 (quoting *Fisk v. McDonald*, 167 Idaho 870, 883, 477 P.3d 924, 937 (2020)). While this is an accurate description of what we said in *Fisk*, our decisions in *Suhadolnik*, *Phillips*, and *Rich* explain that deposition testimony constitutes sufficient facts to support an expert's claim that he familiarized himself with the community standard of care when the deposition testimony clearly articulates the community standard. *Suhadolnik*, 151 Idaho at 117–18, 254 P.3d at 18–19; *Phillips*, 166 Idaho at 748–49, 463 P.3d at 382–83; *Rich*, 172 Idaho at 711, 535 P.3d at 1084.

The majority opinion states that the deposition testimony "was sufficiently descriptive for Dr. McIlraith to familiarize himself with the community standard of care regarding medication reconciliation . . . ." Majority Op., *supra* at 31. The problem with this statement is that Dr. Fry never described the standard of care at all. At best, he described the medication reconciliation procedure that St. Luke's requires him to follow. However, Dr. Fry never testified that St. Luke's institutional practice was consistent with the local standard of care.

Our caselaw establishes that an institutional practice is not enough to establish the community standard of care. In *Fisk*, this Court specifically stated that it has "never held that a hospital's internal policies, standing alone, were sufficient to allow an expert to ensure that the community standard of care does not deviate from the national standard." 167 Idaho at 882, 477 P.3d at 936. In that case, we concluded that a hospital policy statement that it utilized the ANA standards of practice was not enough to establish the ANA standards as the community of standard of care:

> It is not immediately clear from this policy statement that the ANA standards were the community standard of care in the Post Falls/Coeur d'Alene area. It could be that the Hospital only intended to supplement the community standard of care with

47

the ANA's standards of practice. Or the Hospital may have the policy statement as a form of aspirational goal for its nurses. . . . That is not to say that the Hospital's policy statement cannot help inform [the nurse]'s understanding of the community standard of care, but it does not provide enough on its own to determine whether the ANA standards were the community standard of care.

*Id.* Our holding in *Fisk* is consistent with the plain language of section 6-1012, which states that the applicable community standard of care is specific to "*the class of the health care provider*[.]" *See* I.C. § 6-1012. When a medical malpractice claim alleges negligence by a medical provider, the statute focuses the standard of care inquiry on the type of medical provider, rather than the facility where the provider practiced. *See id.*

The majority opinion errs because it concludes that Dr. Fry's testimony concerning St. Luke's medication reconciliation process established the applicable standard of care. Specifically, the majority opinion concludes that Dr. Fry's deposition testimony "describes a structured process of medication reconciliation embedded in St. Luke's workflow that is enforced by the hospital's electronic ordering system and supported by nursing and pharmacy staff." Majority Op., *supra* at 30. Dr. Fry's testimony describes a St. Luke's process or practice initiated by nursing staff which, if properly performed, should prompt the doctor to confirm any new medications the doctor is ordering with the medications previously entered by the nurse. Under *Fisk*, a hospital policy or practice, standing alone, is insufficient to establish the community standard of care. 167 Idaho at 882, 477 P.3d at 936. Further, it is unclear how a process initiated by nursing staff can establish the standard of care for board certified internists.

Although Dr. Fry was questioned during his deposition about the standard of care for nursing staff, he was never asked about the standard of care applicable to himself or board-certified internists. He was never asked about whether he was trained in medical school to ask patients about medications they are currently taking. Absent some further explanation from Dr. Fry for why he performs medication reconciliation, it could be that the St. Luke's process and its electronic ordering system were "only intended to supplement the community standard of care" or it could be that St. Luke's "may have the policy statement as a form of aspirational goal for its nurses." *See Fisk*, 167 Idaho at 882, 477 P.3d at 936. As a result, the district court did not err when it relied on this Court's caselaw to conclude that Dr. Fry's deposition testimony failed to clearly articulate the community standard of care.

The majority opinion also relies on testimony from Dr. Fry that he was not negligent and that he followed the standard of care. However, those parts of Dr. Fry's deposition were not

included in the Thaetes' timely-filed deposition materials. Nor was the St. Luke's policy that is discussed in the majority opinion. As a result, those materials cannot buttress Dr. Fry's testimony concerning St. Luke's medication reconciliation practices. Even if those materials were timely filed, they would not transform Dr. Fry's testimony into a clear articulation of the community standard for the particular time, place, and specialty at issue. Dr. Fry's statements that he was not negligent and that he followed the standard of care fail to "clearly articulate" the standard of care he had in mind when he made those statements. And the St. Luke's policy cannot, standing alone, clearly articulate the community standard of care. Dr. Fry's testimony that he followed St. Luke's policy and did what the electronic ordering system required of him, without any further explanation about why he does those things, did not clearly articulate the community standard of care.

The majority opinion's conclusion that Dr. Fry's deposition testimony adequately identified the community standard of care for prescribing medications is similarly flawed. First, the deposition testimony that the majority opinion relies upon was not included with the timely filed summary judgment materials. Second, even if the testimony were included in the timely filed materials, Dr. Fry's testimony that he would not have prescribed Paxil if phenelzine had appeared in the medication history only indicates his personal belief and knowledge that the two medications were contraindicated. I suspect some follow-up questions about <u>why</u> he would not prescribe those two medications together could likely have elicited testimony that clearly articulated the community standard of care. But those questions were not asked during Dr. Fry's deposition.

Finally, the majority opinion indicates that "employing a measure of common sense," Dr. McIlraith possessed a sufficient foundation to offer expert testimony on the applicable standard of care. Majority Op., *supra* at 38. But neither section 6-1012 nor section 6-1013 identify a "sliding scale" of proof that changes depending on whether the standard of care is "common sense." Additionally, if a standard of care seems to be one of common sense, then one would expect that it would not be difficult to obtain a concession to that standard during a deposition. Adopting the "common sense" standard articulated in the majority opinion not only runs afoul of Idaho statutes and this Court's caselaw, but it will certainly prove difficult to apply in many medical malpractice cases.

The determination of whether the Thaetes laid the necessary foundation for Dr. McIlraith's expert opinion was one committed to the sound discretion of the district court. For the reasons discussed, the district court's decision was consistent with the applicable statutes and our caselaw

interpreting them. While the majority may have reached a different conclusion if they had been sitting in the trial court's seat, that difference of opinion does not establish an abuse of discretion. I therefore respectfully dissent from Section IV.C of the majority opinion.

**C. The district court did not err in granting St. Luke's motion for summary judgment.**

For the reasons previously discussed, the district court did not abuse its discretion when it determined that Dr. McIlraith's expert opinion was inadmissible. As a result, the Thaetes failed to meet their affirmative burden under sections 6-1012 and 6-1013. Because the Thaetes failed to present the expert testimony necessary to sustain their burden under those statutes, the district court did not err in granting St. Luke's motion for summary judgment. For this reason, I respectfully dissent from Section IV.E of the majority opinion.